ORLANDO AND AMANDA SAWYER, Respondents, v. THE HANNIBAL AND ST. JOSEPH RAILROAD COMPANY, Appellant.

1. *Bailees—Railroads—Negligence.*—Carriers of passengers not being insurers of their safety, are not responsible where all reasonable care, skill and diligence, prudence and foresight, have been employed. They are not liable for mere accident, or misadventure, any more than for the act of God, or the public enemy, for any sudden convulsion of nature, or an unknown or unforeseen destruction, or an unknowable insufficiency of some part of the road. In addition to this, there must be some actual negligence, or want of strict care, diligence, and foresight.

2. *Bailees—Railroads—Negligence.*—In a suit by a passenger on a railroad train for injuries occasioned by the cars being thrown into a chasm, occasioned by the burning of a bridge by the public enemy, of which defect in the road the conductor of the train was prevented from receiving notice by the agents and servants of the road being driven off or overawed by the enemy,—an instruction confining the issue of negligence to the particular case in the running of the cars, and telling the jury that "if the train was conducted and managed with as much care and diligence as a very prudent and careful man would have conducted the same where his own interest and safety were concerned, taking into consideration all the circumstances surrounding the case, and that the injury complained of was the result of mere accident, then the carrier was not liable for the injury," was improperly refused, as it presented to the jury the principle that the defendant was not to be held liable for mere accident, in the absence of any want of

Sawyer et al. v. Hann. & St. Jo. R.R. Co.

that degree of care and prudence which the law requires. If it were not the negligence of the conductor of the train, or his want of care and foresight, that was the proximate or remote cause of the accident and injury, the carrier was not liable.

3. *Practice—Instructions.*—Instructions should not be so framed, nor given and refused, as to exclude from the jury the consideration of the points which are fairly raised by the evidence.

4. *Practice—Jury—Misbehavior.*—A traverse juror is not a competent witness to prove misbehavior in the jury. For a jury to make up the amount of the verdict by each juror naming a certain sum and then dividing the aggregate of the sums specified by the number of the jury, is an improper mode of making up the verdict, and is misbehavior on the part of the jury.

5. *Practice — Excessive Damages — Verdict.* — Verdict set aside for excessive damages.

*Appeal from Buchanan Circuit Court.*

On the 19th day of August, 1862, respondents commenced suit in the Circuit Court of Buchanan county, to recover the sum of $15,000 for injuries which Amanda, wife of Orlando Sawyer, received on the night of the 3d of September, 1861. Respondents state that said Amanda was a passenger on appellant's railroad by virtue of a contract, and that the train of cars on which she was a passenger was precipitated into Platte river at a point where the appellant's road crosses said stream in Buchanan county; that the disaster was caused by the negligence, recklessness and unskilfulness on the part of the agents of the appellant in conducting and managing the train on which she was a passenger from Palmyra to the appellant's depot in St. Joseph; that appellant's road was defective and insufficient by reason of the railroad bridge spanning Platte river having been destroyed between the hours of one and five o'clock P. M. on the day aforesaid, and that by reason of the negligence and unskilfulness of the agents of the appellant and the insufficiency of said railroad and bridge the said respondent was injured in the head, shoulders and other portions of the body, destroying her health and rendering her incapable of performing any sort of labor whatever.

The appellant denied that the train of cars described in the respondents' petition was run carelessly, recklessly or at

full speed at the time and place alleged in said petition. Appellant admitted that the bridge across Platte river on its railroad was destroyed at the time said train of cars approached, ran and was precipitated into said river ; but alleged that some time in the evening or prior to the regular passenger train of that day, to-wit, the 3d day of September, 1861, bound west from Hannibal to St. Joseph, a band of armed men, enemies to the Government of the United States and the Provisional Government of the State of Missouri, who had rebelled against and thrown off their allegiance to said governments, drove off the agents and employees of appellant on that part of said railroad where said bridge was standing, and set fire to and burned down said bridge, and whilst it was burning and after it was burned down ,until the arrival of said train at the place where said bridge stood, guarded it, and that part of appellant's railroad where said bridge had stood, so as to prevent, and actually did prevent, any of appellant's agents or employees from giving warning or notice to the conductor or other agents or employees on said train. Appellant avers that by reason of the premises said train was run and precipitated into Platte river where said railroad crosses said river, and where said bridge had stood, although said train of cars was well manned and equipped, and the conductor in charge of said train of cars and the employees on it well, carefully and skilfully performed and discharged their respective duties in conducting, running and managing said train of cars ; that said train of cars was run and precipitated into said river as aforesaid without any negligence, unskilfulness, misconduct or fault on the part of the appellant, its officers, agents and servants, and could not have been prevented by any vigilance, diligence, practice, agency or foresight of appellant, its officers, agents or servants ; that said accident to said train of cars is the same accident of which respondents complain in their petition against appellant. Appellant says that the defect and insufficiency complained of in respondents' petition is not a negligent defect and insufficiency, and denies that

said respondent Amanda sustained any damage in consequence of any negligence and unskilfulness of appellant, its officers, agents or servants, as is alleged in the respondents' petition.

The evidence on the part of the respondents tended to show that the bridge across Platte river on appellant's road was burned down about 5 o'clock P. M. on the 3d day of September, 1861; that the respondent Amanda Sawyer was a passenger upon the train bound west that day to St. Joseph; that it arrived at Platte river about 11 o'clock at night, and ran and was precipitated into Platte river; that in consequence thereof she received a good many bruises and a scalp wound on her head; her shoulders and arms were bruised, but no fractures of any kind. The scalp wound was the principal one. She did not seem to have good use of her arms; she could get up, stand up and walk; she was attended about ten days by a physician in St. Joseph, who testified that "the scalp wound as well as all such scalp wounds are very easily cured, heal up and get well very readily as a general thing, and I saw nothing about this to prevent such a result; and when I quit attending the plaintiff, my opinion was she would soon get well; the wounds upon the arms and shoulders I considered only upon the muscles, not serious; but her nervous system received a great shock from the jar she received." She admitted on her way from St. Joseph and on the Sunday after she got home, that she was not seriously hurt. She commenced teaching school in two or three months after the accident, walking to and from the school-house, a distance between a quarter and a half mile.

The evidence on the part of the appellant tended to show that the country all along the line of the appellant's railroad was at the time of the accident in question, and had been, for several months prior thereto, in a state of rebellion and open war with the Government of the United States and the Provisional Government of Missouri, established in July preceding; that the great mass of the citizens along the line of said railroad were hostile to the Government of the Unit-

ed States and the Provisional Government of Missouri and in sympathy with the rebels; that the officers, agents and employees on said railroad, as a class, were loyal to the Government, State and National, and gave their aid and influence in favor of the Federal and State Governments in the great struggle with treason; that said railroad after the inauguration of hostilities was used almost daily, on some part of the line, in transporting Federal troops and munitions of war over it; that in consequence thereof the appellant, and its officers, agents and employees, incurred the most bitter and unrelenting animosity of the rebels and their sympathisers, and by way of retaliation they perpetrated almost daily acts of hostility upon the appellant's railroad and the agents and employees on the same, such as burning cars, bridges and culverts, tearing up the track, sawing ties, &c., and firing into passenger trains, commencing in June, 1861, and continuing from that until the burning of the bridge across Platte river on the afternoon of September the 3d, 1861; but nearly all of these depredations and acts of hostility had been done on the eastern division of said road; that the western division had been regarded as comparatively safe for trains and passengers during all of this period, there never having been any disturbance on the railroad so near to St. Joseph as the bridge across Platte river, prior to said accident; that the passengers on the train in question were well aware of the state of the country and condition of things along appellant's railroad.

That a few days prior to the said accident a considerable body of armed rebels had rendezvoused about 13 to 15 miles north of the bridge across Platte river, and their camp was known as "Patton's Camp;" also a considerable body of armed rebels had rendezvoused about 6 miles south of said bridge, and their camp was known as "Gibson's Camp." Small bands of armed men were constantly passing to and from these camps on the east and west sides of said bridge, reconnoitering, watching and reporting the movements of trains upon appellant's railroad; that the demeanor of these

bands was so menacing and terrifying as to completely over-awe the citizens in the immediate vicinity of the bridge, who had any proclivities for the Government; that they were afraid to go away from their homes so as to give any information to the agents and employees of appellant of the burning of said bridge, lest they should be killed for so doing; and said bands had threatened and so terrified the section hands on. the section extending to the bridge on the east side, and whose duty it was to watch the bridge and see that it was safe, that they refused on the day before the accident to go over that part of the section lying between Easton ($3\frac{1}{2}$ miles east of bridge) and the bridge, the greatest portion of the distance being through timber and brush, which afforded good lurking-ground for the bushwhackers to way-lay and shoot them.

The bridge was burned down by a band of 12 or 14 armed men between 2 and 5 o'clock in the evening of the 3d of September, 1861. They guarded the railroad in the vicinity of the bridge from the time they went to it until after the accident in question, which took place about 11 o'clock at night, so that there was no possible chance for any agent or employee to have gone to the bridge and ascertained that it was burned down, without running a great risk of losing his life. Three or four of these armed men were seen on the western abutment, looking down upon the wreck, after the disaster, and were called upon by the mail agent to come down and assist him and the baggage master (the only two on the train capable of rendering assistance to the wounded and dying) in extricating the passengers from the wreck; but they never said a word—rendered no assistance. After the mail agent and baggage master had extricated all they could from the wreck, and then started towards St. Joseph for a relief train, these men struck out in a northwesterly direction. These men found several ties thrown across the track, and found a small bridge on fire about $\frac{3}{4}$ of a mile from Platte bridge, from the light of which they discovered about a half a dozen armed men concealed behind some

brush near to said bridge, and when they returned about day-light with a relief train, they found another culvert, a short distance west of the first, on fire ; the next morning after the relief train arrived at the scene of disaster, the baggage master started east, to Brookfield, to give information. On his way he saw several small bands of rebels along the railroad, at short intervals, until he got a considerable distance from the scene of disaster. Some of the neighbors likewise saw one or two armed rebels very early the next morning a short distance west of the Platte bridge.

There were seven men on the train in the employ of the appellant at the time of the disaster, conducting, running and managing it, *five of whom were killed.* Amongst the number were Stephen G. Cutler, the conductor and ——— Clark, the engineer.

Col. Hayward, the general superintendent of the appellant's railroad, testified that Col. Curtis, on behalf of the Government of the United States, notified him in June preceding that the Government would take possession of the road and use it whenever it desired for the transportation of troops and munitions of war; that when the Government did not need it for this purpose, the company could use it for the transportation of passengers and property. The officers of the appellant at that time all resided in Hannibal. It was the policy of the Government to keep the road open, and have trains run on it with as much regularity as possible, so as to show its power and majesty, and thus have its moral effect upon the citizens along the line.

At the request of the respondent the court gave the following instructions to the jury :

1. That a railroad company which carries passengers for hire binds itself to carry safely those whom it takes into its cars, as far as human care and foresight will go ; that is, the utmost care and diligence of a very cautious person, and is responsible for even the slightest neglect.

2. If the jury believe, from the evidence, that defendant was such a railroad company, and that plaintiff Amanda

Sawyer is the wife of Orlando Sawyer, and that she was a passenger on the cars of the defendant, under contract to carry her over its railroad to the depot in the city of St. Joseph, and while she was such a passenger said defendant or its officers or agents in charge of said cars did not conduct and manage said cars with the care and foresight explained in the first instruction, and that in consequence of the want of such care and foresight said cars were precipitated into Platte river where said road crosses the same, and plaintiff Amanda Sawyer was injured thereby, they will find for plaintiff the damages said Amanda Sawyer sustained by reason of said accident.

3. If the jury find for plaintiff, they will, in assessing damages, consider not only the bodily pain and injuries sustained by said Amanda Sawyer, but will also consider the alarm, nervous injury and mental anguish sustained by her in consequence of said injury.

To the giving of which instructions the appellant at the time excepted.

The defendant's attorney then asked the court to give the following instructions to the jury :

1. That unless the jury believe from the evidence that the defendant's road, or the bridge on Platte river, was, at the time of the grievance complained of, out of repair by the fault or negligence of the defendant or its agents, or that the train of cars in which plaintiff Amanda Sawyer was being transported was run and precipitated into Platte river, when the bridge over the same had been destroyed, by the negligence or mismanagement of defendant, or of its agents conducting or running the same, they will find for the defendant.

2. That negligence is a question of fact, which is to be ascertained by the jury taking into consideration all of the facts and circumstances connected with, or surrounding, the act complained of. The jury are not authorized in this case, if they should find for the plaintiff, to find exemplary damages, but they are confined to the actual or real and natural

damages sustained by the plaintiff growing out of the injury complained of.

3. If the defendant had agents running their locomotives and cars of competent skill, and said agents used all of the care and diligence that would be used by a very prudent and careful man under similar circumstances when his own safety was concerned, and without negligence, then the defendant would not be liable to the plaintiff for any accident which might happen while being transported under such circumstances.

4. The court instructs the jury that the defendant was bound, by the laws of this State, to receive and transport all passengers offered upon said road for transportation, at the time of the happening of the supposed injury named in plaintiffs' petition.

5. If the defendant had agents running its locomotives and cars of competent skill, and said agents used all of the care and diligence that would be used by a very prudent man in his own affairs, then the defendant would not be liable to plaintiffs for any accident which might happen them while being thus transported on the road of defendant.

6. If the agents of defendant who were running the train of cars upon which Amanda Sawyer was a passenger at the time of the injury complained of, conducted and managed said train with as much care and diligence as a very prudent and careful man would have conducted the same where his own interest and safety were concerned, taking into consideration all of the circumstances surrounding the case, and the injury complained of was the result of mere accident, then the defendant is not liable for the same, and the jury will find for the defendant.

7. If the jury believe from the evidence, that at the time alleged in plaintiffs' petition, a band of armed men, enemies to the Government of the United States and to Missouri, drove the defendant's agents and employees off that portion of defendant's road where Platte river bridge was then standing, and set fire to and burned down said bridge, and

while said bridge was burning, and after it was burned down, until the arrival of said train described in said petition, guarded that portion of defendant's road where said bridge had stood so as to prevent, and actually did prevent, any of defendant's agents or employees from giving any notice or warning to the conductor or agents or employees on said train that said bridge was burned down, and that said conductor and none of the other agents or employees on said train had any knowledge or information that said bridge was burned down, they will find for the defendant, notwithstanding they may believe that the plaintiff Amanda Sawyer was a passenger on said train, and that said train ran and was precipitated into Platte river in consequence of said bridge being burned down and the said Amanda Sawyer was thereby injured.

8. If the jury believe from the evidence that the accident in question could not have been prevented by any vigilance or foresight of the defendant, its officers, agents or employees, they will find for the defendant.

9. If the jury believe from the evidence that the plaintiff Amanda Sawyer received the injuries complained of in plaintiffs' petition in consequence of an act of the enemies to the Government of the United States and of Missouri, they will find for the defendant.

10. The jury are instructed that the defendant, at the time of the injury complained of in the petition, was a common carrier of passengers and property, and as such was required by a statute of the State of Missouri to carry the plaintiff Amanda Sawyer; and if the jury believe from the evidence that said Amanda Sawyer was a passenger on the train described in said petition, and that the conductor and other agents and employees on said train, in managing, conducting and running said train, exercised that degree of care and diligence which a very prudent man would exercise under similar circumstances, and that a band of armed men, enemies to the Government of the United States and the State of Missouri, had burned down the bridge across Platte

river on defendant's road a few hours previous to the arrival of the train, and that said act was not known to said conductor or other agents or employees on said train, and that said train was run and precipitated into Platte river in consequence of said burning of the bridge, then the defendant was not guilty of negligence, and they will find for defendant notwithstanding they may believe from the evidence that said plaintiff was injured by being run and precipitated into Platte river.

The first four of said instructions the court gave, but the balance of said instructions it refused to give; to which refusal of the court to give said instructions appellant, at the time, excepted.

The case was then submitted to the jury, who found for the respondents, and assessed the damages at $6,900, for which the court rendered judgment.

The appellant then filed a motion to set aside said verdict and grant a new trial, assigning the usual reasons and that the damages were excessive, and also that the jury had found their verdict as follows: "Because the jury improperly ascertained their verdict by casting lots, or by setting down each one a different speculative amount and dividing the aggregate by twelve, and thus found an excessive verdict."

The affidavit of Jacob Hursch, one of the jurors, showed that said verdict had been found as above stated.

The court overruled said motion, to the overruling of which the appellant at the time excepted and filed its bill of exceptions, and brings this case to the Supreme Court by appeal.

· *Carr* and *H. M. & A. H. Vories*, for appellant.

On this record the following points arise:

I. The appellant was a common carrier of passengers at the time of the grievances complained of, and as such bound to carry all who wished to be carried, unless there was some legal excuse for refusing.

II. If the appellant had refused to carry the respondent Amanda Sawyer, the same as it did other passengers, it would

have been guilty of *a breach of duty*, and liable to an action for damages.

III. The relation of passenger and carrier existed between said respondent Amanda Sawyer and the appellant.

IV. Common carriers of passengers are not *insurers* of the safety of their passengers as common carriers of goods and the baggage of passengers are. For an injury happening to a passenger by a mere accident, without any fault, they are not liable; but they are liable only for the want of due care, diligence and skill.

V. That part of the country where the accident occurred was in a state of furious civil war at the time of said accident; the bridge over Platte river, on appellant's railroad, was burned down by public enemies, and that part of appellant's railroad so guarded that no agent or employee could give warning to the conductor or any other agent or employee on the train of that fact, and thus prevent said train from running and being precipitated into Platte river.

VI. The agents and employees of defendant were not guilty of negligence in conducting, managing and running said train as they did at that time, as that part of the railroad was guarded by the public enemy, so that it was impossible for any agent or employee to give them warning of the danger at Platte bridge, and, the whole line of the road being infested with enemies, it was safer, in the absence of positive information to the contrary, to run ahead and take the chances.

VII. The instructions given to the jury at the request of the respondents entirely ignore the state of war then existing, and the difficulties and dangers (growing out of the state of war) which beset the appellant in running its trains. They exclude from the consideration of the jury the defence set up by the appellant; they are calculated to mislead, and hence do injustice.

VIII. Even if a clear legal liability be fixed upon the appellant, the damages assessed are out of all proportion to the injury received, and hence they are excessive.

IX. One or more managing men on the jury procured the

guileless and unsophisticated members of the jury to agree to make their verdict by each one setting down the amount for which he was willing to render a verdict in favor of the respondents, and then divide the aggregate by the number of the jury ; and after getting them into this agreement, said managing ones fraudulently set down the sum at an enormous amount and divided the aggregate by twelve, and thus secured a verdict for an excessive amount.

It is admitted by the pleadings that the appellant was a common carrier of passengers at the time of the accident alleged in the respondents' petition, and as such it was bound by a statute of this State to " furnish sufficient accommodation for the transportation of *all* such passengers, baggage, mails, and express freight, as shall, within a reasonable time previous thereto, be offered for transportation at the place of starting, at the junction of other roads, and at the usual stopping-places ;" " and shall be compelled to receive *all* passengers, personal baggage, mails, and express freight, offered for transportation." " Every such railroad corporation is hereby required to transport passengers," &c. (Sess. Acts 1861, §§ 1 & 2, p. 53.)

Here is a very rigid and onerous duty imposed upon the appellant by a statute of the State, "any violation or evasion" of which might be pleaded in bar to any suit brought by such railroad corporation, thus depriving it of its standing in court by depriving it of its capacity to prosecute suits. Superadded to this disability is a penalty of a thousand dollars for each and every violation of the provisions of said act—immaterial how trivial—to be recovered by civil action in the name of the State. (Ib. §§ 10 & 11.)

There are no exceptions nor limitations to the duty thus imposed as there were by the common law. It is to be performed anyhow and at all events. The appellant was bound, then, to carry the respondent Amanda Sawyer when she offered herself; otherwise it would have incurred the penalty and forfeiture provided by said act, and, in addition, she might have sued the appellant for a failure to perform its duty under said act.

This act does not prescribe what degree of care and diligence should be exercised by the appellant in the discharge of this duty. It is a principle of law that whenever a duty is imposed by law, the exercise of reasonable care and diligence in the performance of such duty is a sufficient compliance. The law does not require impossibilities.

The relation of carrier and passenger existed between the appellant and the respondent Amanda Sawyer at the time of the accident in question. Did the appellant fully and faithfully perform the duty thus imposed by law? It is affirmed that it did, and hence it ought not to be held liable.

But if the right to recover in this case be based upon the common law, the respondents must fail. There is a broad and palpable distinction between the liability of a common carrier of goods and baggage, and a common carrier of passengers. In the former case they are *insurers* of the safe transportation and delivery of the goods and baggage confided to them, with two exceptions, viz., the act of God, and the public enemy (Red. §§ 124, 141; Ang. Carr. § 521); in the latter case, "*not being insurers,* they are not responsible for accidents where all reasonable skill and diligence has been employed." (Sto. Bailm. § 602; Red. § 149, and authorities there cited; Ingalls v. Bills et al. 9 Metc. 1; Smith v. Han. & St. Jo. R.R. Co., decided at the present term.)

"When everything has been done which human prudence, care and foresight can suggest, accidents may happen. The lights may in a dark night be obscured by fog; the horses may be frightened; the coachman may be deceived by the sudden alteration of objects on the road; the coach may be upset accidentally by striking another vehicle, or by meeting with an unexpected obstruction, or, from the intense severity of the cold, the coachman, although possessed of all proper skill, and taking all due and reasonable care, may at the time become physically incapable of managing his horses, or of otherwise doing his duty: in all these and the like cases, if there is no negligence whatsoever, the coach proprietors are exonerated." (Sto. Bail. § 602.)

Negligence is a relative term. What would be gross negligence in times of profound peace, frequently is the only true policy to be pursued in time of war. Now, were the appellant's agents and employees on that train guilty of negligence in running on what they supposed to be Platte bridge that night, under the circumstances surrounding them? It is thought not. Were the passengers deceived, or did they not understand the true state of affairs along the line of the road? That very train had been turned back not far from Palmyra in consequence of a bridge having been tampered with the day before so that it could not be crossed, and every passenger on it knew the fact.

The fact is *the passengers knew and understood the state of affairs along the line of the road just as well as the agents and employees*, and they were willing to take their risks and stand their chances along with them without holding the appellant bound to carry them with *safety* as they would in times of profound peace. They certainly were willing to take, and actually took, all risks to which a state of war necessarily exposed them.

The testimony of the surgeon who dressed the injured respondent's wounds, and of her neighbors who saw her daily, together with her own admissions, establishes beyond all controversy that she was not *permanently* injured. A short time after the disaster we find her discharging, acceptably, the duties of a teacher, in Kansas, and ever since attending to her household duties as a mother and wife. We do not find, in her case, a helpless cripple, her life intolerable. Nor do we find her a charge upon private or public charity. Nor are her services and counsels lost to her husband or child. She still lives in the full vigor of body and mind, to cheer and counsel the one, rear and educate the other. Such being the case, the damages assessed are out of all proportion to the injury received—they are excessive; and to suffer the verdict and judgment in this case to stand, would be to convert the courts of the country from instruments for meeting out even-handed and exact justice to parties litigant, engines

of oppression and injustice. (21 Mo. 354; 12 Barb. 492; 19 Barb. 461.)

Our Practice Act expressly provides for granting a new trial "when the jury shall be guilty of *misbehavior*." (R. C. 1855, § 4, p. 1286.) The affidavit of Jacob Hursch, one of the jury, clearly shows that the jury was "guilty of misbehavior"—gross misbehavior—in finding the verdict in this case. The policy of our law is to let in all the light upon a subject that can be obtained. It is immaterial whether it comes through a stained medium or not. It is for the court or jury to weigh it, and say what it is worth. If the appellant is not permitted to show the misconduct of the jury in finding this verdict by the testimony of one of their number, then the misbehavior of a jury can scarcely ever be shown. ("Breach of Duty," see Bartlett v. Crozier, 17 Johns. 438)

Points and authorities for respondents :

The instructions given by the court, on motion of plaintiffs, are correct. The first of these instructions is a literal abstract from Story on Bailment, and is the well established law. (Sto. Bail. § 601; 2 Kent's Com. 600; Greenl. Ev. § 221; Stokes v. Salstonstall, 13 Pet. 181; Derby v. Philad. & Read. Railw., 14 How. 483; St. bt. New World v. King, 16 How. 469–74; Redf. Railw. 323.)

The second instruction is but an application of the principle announced in the first instruction to the facts of the present case ; and the first instruction being correct, the second instruction is correct also, as a matter of course.

The third instruction states the measure of damages correctly. (Canning v. Inhab. of Williamstown, 1 Cush. 452; Morse v. Aub. & Syr. Railw., 10 Barb. 623; Redf. Railw. 337, n. 3; Seger v. Town of Barkhamsted, 22 Conn. 298; 20 Pa. 292.)

The instructions of the defendant that were refused by the court were properly refused. The first of these instructions had no application to the issues of the case, and, besides, is not the law. It asserts that defendant was bound by law to

transport all persons over its road who offered for that pur
pose, at the very time of the disaster, although it was unsafe
and dangerous to do so. This is not the law. (Redf. Railw.
327.)

The fourth and fifth instructions refused by the court are
in direct conflict with the first instruction given for plaintiffs,
and are not the law. (Sto. Bail. § 601; 2 Kent's Com. 600;
2 Greenl. Ev. § 221.)

The sixth and eighth instructions asked by defendant were
properly refused. They assert the principle that if the pub-
lic enemy destroy a bridge on a railroad, that the railroad
company are not required to exercise any care to guard
against accidents at that point, and may carelessly destroy
the lives of their passengers, or injure them to any extent,
with impunity.

The seventh instruction was properly refused. The court
had already declared, in two other instructions given for de-
fendant, that plaintiffs could not recover unless Amanda
Sawyer had been injured in consequence of the negligence
or mismanagement of defendant's agents. This instruction
merely repeated this principle in different words, and was
therefore unnecessary and improper.

The court properly excluded the evidence of juror Hursch
to impeach the verdict. (Taylor v. Giger, Hard. 586; Heath
v. Conway, 1 Bibb, 398; Philips v. Baxter, 1 Bibb, 400; State
v. Baker, 22 Mo. 349; Dana v. Tucker, 4 John. 488; 1 Greenl.
Ev. § 251; Phil. Ev. 4; Pratte v. Coffman, 33 Mo. 77; Gra-
ham on New Tr. 111–12.)

The verdict is not excessive. The evidence makes a case
of most outrageous carelessness on the part of defendant,
and of most intense suffering on the part of Mrs. Sawyer.

The motion for a new trial was properly overruled. (Redf.
Railw. 347; Woodson v. Scott, 20 Mo. 272; Wells v. Saw-
yer, 21 Mo. 357; 1 Graham & W. on New Trials, 418, s. p.)

HOLMES, Judge, delivered the opinion of the court.

The cause of action is based wholly on the ground of neg-

ligence. A new trial is asked mainly for the reasons that the court below erred in the giving and refusing of instructions, and that the damages were excessive. It is also urged that there was misconduct in the jury respecting the manner in which the verdict was made up. The allegation of negligence in the petition was, that the train of cars was precipitated into the Platte river, and the plaintiff injured, by the negligence and unskilfulness of the officer or agent employed by defendant to manage, conduct, or run the same, on the night of the third day of September, 1861, whilst running carelessly, recklessly, and at full speed, when danger was, or should have been, apprehended; that the railroad was at the time defective and insufficient, by reason of the bridge over the Platte river having been burned down and destroyed between one and five o'clock of the afternoon preceding; and that by reason of such negligence and unskilfulness of the agent or officer of defendant, so, as aforesaid, running, managing and conducting the said train of cars, and by reason of said defect and insufficiency in the railroad and bridge, the plaintiff suffered the injuries complained of. The answer denied all negligence, and alleged in substance that the bridge had been burned down by the public enemy, a few hours previous to the passing of the train; that the section agents along the road in that part, whose duty it was to watch the condition of the track, had been overawed and driven off, so that no notice of the burning of the bridge had come to the knowledge of the officers in charge of the train; and that the defect or insufficiency of the road complained of was not a negligent defect or insufficiency.

It is clear from the evidence that there was no other defect or insufficiency in the bridge or the railroad than what arose from the fact that the bridge had been burned down by the public enemy, a few hours previous to the passing of the train. The accident happening solely in consequence of the bridge having been destroyed in this manner, it is plain that this was not what is ordinarily understood by a defect or insufficiency in a railroad. The question of negligence that was

really in issue in this trial, must be regarded as having reference solely and exclusively to the acts and conduct of the officer who had charge of the train upon that occasion. There was much evidence and some argument in the case, touching the operations of the public enemy, the insurrectionary state and condition of the country, the military orders, and the policy of the Government with regard to keeping the railroad open, the propriety of the action of the railroad company in continuing to run passenger trains when the railroad and trains were threatened with danger, the duty of the company to take all passengers who offered to go on the road, and the risks which passengers voluntarily undertook in the face of dangers known to them, and for which they were to be held alone responsible. This kind of evidence was not pertinent to the issue, and it should properly have been excluded. The question was not whether the train should have been run at all on that day, but whether there was any such negligence, or want of care, prudence, and foresight, on the part of the officer who was engaged in running and conducting the train on the particular occasion, as would render the defendant liable for damages for the injuries sustained by a passenger; and on this issue the acts and doings of the public enemy were in no otherwise important than as showing when and how the bridge was destroyed, and that it was done by a power beyond the control of the defendant, or of the officer in charge of the train, or that it was burned down at such a time and under such circumstances that they might and ought to have had knowledge of it, and so were to be held responsible for their ignorance of the fact, as amounting to that degree of negligence or want of care, diligence, and foresight, which the law required of them. It is a well established rule of the law of carriers of passengers, that where an accident and injury occur by reason of the breakage of carriages, cars, or machinery, or by reason of any defect of construction, or any insufficient condition or state of repair of the railroad or its bridges, these facts alone import some degree of negli-

gence, and make a *prima facie* case of negligence for the plaintiff sufficient to shift the burden of proof upon the defendant. (2 Greenl. Ev. § 222.) And when the simple facts were shown that a railroad bridge was down, and that the train was precipitated into the chasm, and the plaintiff injured, it may be said that a *prima facie* case for the plaintiff was made out. On that evidence alone, there would certainly appear to be a negligent defect or insufficiency in the railroad; but when it was made to appear further that the bridge was down by reason of the sudden inroad and hostile act of the public enemy, and not by reason of any deficiency of construction or any insufficiency in the condition and state of repair of the road, that *prima facie* case, so far as resting upon this ground alone, was completely rebutted and disproved. The only question that would remain for inquiry under this petition would be, whether there had been any negligence, or want of proper care, diligence, skill, and foresight, on the part of the conductor or officer engaged in running, managing and conducting the train. There was no allegation of negligence in any other officer or agent of the company on this occasion, whether engineer, station agent, or section man. The evidence tended strongly to show that that the men whose duty it was to watch the condition of the road in that part, and report any insufficiency, had been driven off by hostile armed bands of the enemy, so that they, as well as other persons in the neighborhood, who had knowledge of the fact, were afraid to risk their lives by undertaking to inform the agents of the company to the east of the bridge of the fact that the bridge had been destroyed; and no such information had reached them. The inquiry was thus narrowed down to the actual conduct of the conductor of the train, on such facts as he knew, or might have learned by any reasonable diligence in making inquiries. In a case of this kind, it is only on the ground of actual negligence that even a carrier of passengers is to be held liable; the burden of proof is on the plaintiff; and he must establish the fact of negligence by competent evidence,

otherwise he cannot recover. Carriers of passengers not being insurers of their safety, are not responsible where all reasonable care, skill and diligence, prudence and foresight have been employed. (2 Greenl. Ev. § 222; Sto. Bail. § 602; Redf. Railw. 323–9 and notes; Holbrook v. Ith. & Schenec. R.R., 2 Kern. 236.) They are not liable for mere accident or misadventure, any more than for the act of God, or the public enemy, for any sudden convulsion of nature, or an unknown or unforeseen destruction, or an unknowable insufficiency of some part of the railroad. In addition to this, there must be some actual negligence, or want of strict care, diligence and foresight. As to what constitutes such care, diligence and foresight, or what shall be the standard of judgment in such cases, the law does not seem to have defined any positive and unbending rule. Various expressions are used by different authorities. The terms *utmost, strictest, all human, extraordinary*, have been employed; and it has been said, by very high authority, that "when carriers undertake to carry persons by the powerful and dangerous agent of steam, public policy and safety require that they be held to *the greatest possible care and diligence;*" and that "any negligence in such cases may well deserve the epithet of *gross.*" (Philad. & Read. R.R. Co. v. Derby, 14 How., U. S., 468.) These are very strong, but somewhat indefin ite terms. Numerous decisions have held that the matter of negligence, or care and prudence, is in some degree relative, and that they must be in proportion to the nature, difficulty and peril of the business (Notton v. Western R.R., 15 N. Y., 444); and it can scarcely mean anything more than such care, diligence, skill and foresight as careful and prudent men are reasonably expected to exercise in the particular business, under like circumstances of difficulty and danger. More than this would come near to rendering railroad companies liable in all cases of accident and misadventure. Oftentimes after an accident has happened it is easy to see how it might have been avoided; but if the company were to be held liable in all such cases, it would never be safe for them

to run a train at all. Care and foresight must be taken in reference to the business, the time, the occasion, and the nature of men, or they can have no definite meaning whatever. In this case it does not appear that there was evidence of any positive act of carelessness, omission or remissness of his ordinary functions and duties on the part of the conductor, unless it were a lack of the requisite degree of prudence and foresight in view of the dangers to be anticipated ahead on the road. He had no knowledge of the presence of the enemy in force about the bridge, nor of the fact that the bridge had been burnt, nor does it appear that the station agent at Easton had any intimation of that fact, which he might have communicated to the conductor. He seems to have believed that the train had passed the region where danger was most to be apprehended. The train was running at a speed not above fifteen miles an hour, when the card time required twenty miles an hour. A passenger had intimated to him that he had been uneasy all day, and was fearful that something might be wrong at the bridge which they were approaching, and suggested to him that it would be safer to stop the train before attempting to cross; but he had no particular reason for his apprehension, and the conductor supposed himself to be better acquainted with the actual state of affairs along the road than the passenger. A train had gone safely through the day before, from St. Joseph to Hannibal. More danger seems to have been expected from men firing into the train, than from the burning of the bridges, and that peril would be increased by stopping the train. All the circumstances were to be considered, and the question of a reasonable degree of care, prudence and foresight was a matter for the jury to decide, under the instructions of the court as to the rules of law governing such a question, so far as any such rules have been established. The instructions which were given for the plaintiffs were expressed in broad and general terms, and, so far as they went, laid down the rule accurately enough on the side of plaintiffs. They adopted the language of the best writers on the subject, and they

can hardly be considered as in any way materially objectionable. The instructions given for the defendant, which were also couched in very general terms, would seem to be free of serious objection. Of those that were refused, it can scarcely be necessary that we should particularly notice more than the seventh, eighth, ninth and eleventh. The seventh confined the inquiry to the issue of negligence in running the train of cars on the particular occasion, and told the jury that if the train was conducted and managed with as much care and diligence as a very prudent and careful man would have conducted the same where his own interest and safety were concerned, taking into consideration all the circumstances surrounding the case, and that the injury complained of was the result of mere accident, then the defendant was not liable. This instruction would seem to be entirely correct and proper, and we think it should have been given. It presented a correct view of the question on the side of the defendant, and it enunciated distinctly the important principle that the defendant was not to be held liable for mere accident, in the absence of any want of that degree of care and prudence which the law requires. If it were not the negligence of the conductor, or his want of care and foresight, that was the cause of the accident and injury, proximate or remote, the defendant was not liable. If the burning of the bridge were the act of the public enemy, and the fact were unknown and unknowable to the conductor by the degree of care and foresight propounded in the instructions, then it was the burning of the bridge that was the sole cause of the accident and injury, and in reference to the conductor and the defendant it was pure accident or misadventure.

The eighth instruction was sufficiently in accordance with this last proposition, except in so far as it left out of view the consideration of the question for the jury whether the conductor, in the absence of any knowledge or means of information concerning the burning of the bridge, had exercised the requisite degree of care and foresight, in view of

the information which he had concerning the state of the country, and the probable dangers to be apprehended ahead on the road. This last was a matter for the jury, if there were any evidence before them bearing upon the question. If there were no evidence tending to prove such want of care and foresight, such an instruction might be given; otherwise not. The eleventh instruction contained and submitted this question of care and foresight to the jury, in addition to the same matter embodied in the eighth instruction, and so was free from the same objection; and we think it should have been given. It presented the issue fairly on the side of the defendant, and more definitely than the other instructions which were given in general terms only. The ninth instruction, in reference to the state of the evidence before the jury, contained a correct proposition of law, and might have been given. We think the defendant was entitled to have the benefit of these instructions. The instructions that were given on either side, indeed, placed the whole issue substantially before the jury, but in the most general terms, and mainly on the plaintiffs' side; and by the refusal of these particular instructions for the defendant, undue prominence was given to the plaintiffs' view of the case, and the precise and especial ground of the defence was in a great measure withdrawn from the consideration of the jury, thrown into the background, and apparently negatived altogether. Instructions should not be so framed, nor given and refused, as to exclude from the jury the consideration of the points which are fairly raised by the evidence on either side. (Clark v. Hammerle, 27 Mo. 70.)

In support of his motion, for a new trial, the defendant pro-duced the affidavit of Jacob Hursch, one of the jurymen, to the effect that the jury had arrived at their verdict by agreeing that each juror should write down the sum which he wished to give as damages, that the aggregate amount should be divided by twelve, and that the sum so ascertained should be given as the amount of their verdict; that he was deceived by the fact, that some of the jurors, under this arrange-

ment, put down larger sums than he had anticipated, and that he never would have agreed to the verdict, if he had not been bound by his previous agreement. This was undoubtedly an improper mode of making up a verdict, and it would amount to misbehavior on the part of the jury; but the law seems to be settled that a traverse juror cannot be a witness to prove misbehavior in the jury in regard to their verdict; nor can affidavits of jurors be admitted in support of motions to set aside verdicts on such grounds, thus placing the verdict of the jury in the power of a single juryman. (1 Greenl. Ev. § 252, *a.;* Pratte v. Coffman, 33 Mo. 71; 1 Waterman's Gra. on New Tr., 2d ed., 111–15.)

Another ground for the motion for a new trial was that the damages were excessive. The evidence shows that the plaintiff was precipitated into the wreck of material, and lay buried there until morning, amidst wounded and dying men, in a situation of great horror and distress; but her actual injuries were not serious, consisting chiefly of a cut in the scalp, and bruises on the arms and shoulders. She received medical aid for about ten days, and in two or three months was entirely recovered. She was not permanently crippled or disabled, though receiving a severe nervous shock. The damages were $6,900. In Collins v. Alb. & Schenc. R.R., 12 Barb. 492, this subject received an extended examination. The plaintiff had been injured in the head and foot. The outside of the feet and one toe had to be removed; he was seriously ill for several days, and his life despaired of; he could not be removed home for three months; and he was rendered a cripple for life. The verdict was for $11,000, and it was reduced to $5,000. So, also, in Clapp v. Hudson Riv. R.R., 19 Barb. 462, a verdict of $6,000 was reduced to $4,000, under conviction that a new trial would be granted otherwise. The bone of the plaintiff's leg had been broken between the knee and the ankle, and he had received some flesh wounds in the head. It was four months before he could be carried home, and five months more before he could dispense with the use of crutches; the injury had produced a

curvature in the leg, making one leg an inch or more shorter than the other; and it was probable he would be lame for life. After much consideration, these verdicts were regarded not only as excessive, but to such a degree as to show that there had been some improper influence operating upon the minds of the jury, whether prejudice, a desire to punish the defendants for the carelessness of their agents, or some misconception of duty, or some perversion of judgment. We think the damages in this case are so exhorbitantly excessive, when considered with reference to the actual injuries sustained, and the pain and anguish suffered, for which only the law undertakes to make pecuniary compensation by way of damages, as almost necessarily to imply some misconduct, undue feeling or prejudice, or some misapprehension of the proper measure and lawful object of damages in such cases. They are excessive enough to raise a strong conviction in our minds that the jury regarded more the terrible nature of the accident than the degree of carelessness which they could properly have attributed to the conductor of the train, or the actual amount of injury sustained by the plaintiff. But on this subject we need do no more than indicate our opinion. We think the error of the court below in refusing the instructions of the defendant, as above pointed out, is sufficient to justify a reversal of the judgment.

Judgment reversed and the cause remanded; Judge Wagner concurs; Judge Lovelace absent.