MEISCH, Appellant, v. SIPPY, Respondent.

**St. Louis Court of Appeals, November 17, 1903.**

1. **New Trial**: IMPEACHING VERDICT: MISCONDUCT OF JUROR.
Affidavits of jurors will not be heard for the purpose of impeaching
their verdict; considerations of public policy forbid it. Nor can
a verdict be impeached by affidavits of outside parties to state-
ments made by a juror after his discharge, showing that such
a juror had formed an opinion before the trial. (Per Bland, P.
J.; Reyburn and Goode, JJ., concurring in the result, but ex-
pressing no opinion as to second conclusion.)

2. ———: NEWLY-DISCOVERED EVIDENCE. Affidavit of witness
who testified at the trial can not be looked to as furnishing any evi-
dence of newly-discovered evidence.

3. ———: ———: A new trial will be granted in an action for
breach of promise of marriage, on the ground of newly-dis-
covered evidence, where the witness whose affidavit is offered
would not have been discovered by diligence, and where her
affidavit discloses facts, which, if true, show that no contract of
marriage was ever entered into, although their truth was denied
by the affidavit of plaintiff.

Appeal from St. Louis City Circuit Court.—*Hon. D. D.
Fisher*, Judge.

AFFIRMED.

*Thomas B. Estep* and *Johnson, Houts, Marlatt &
Hawes* for appellant.

(1) No principle of law is more firmly established
in this State than that the affidavits of jurors will not be
allowed to discredit, impeach or overthrow a verdict
returned by them. For much stronger reasons evi-
dence will not be heard of loose declarations tending to
impeach their verdict made by jurors to third persons.
State v. Fox, 79 Mo. 109; State v. Dickmann, 11 Mo.

App. 538, affirmed by the Supreme Court in 75 Mo. 570; State v. Dunn, 80 Mo. 681; State v. Branstetter, 65 Mo. 149; Thompson & Merriman on Juries, p. 547, sec. 445; idem, p. 543, sec. 440; Mergargel & Connell v. Waltz, 21 Pa. Co. C. 633; City v. Plummer, 65 Ill. App. 419; Lane v. Bryant, 37 S. W. (Ky.) 584; Purcell v. Tibbles, 69 N. W. (Iowa) 1120; Estes v. Carr, 30 S. E. (Ga.) 882. (2) All objections to a juror made after verdict must be supported as well by the affidavit of counsel as by client; nothing less than this will suffice. State v. Howard, 118 Mo. 136; State v. Burns, 85 Mo. 49; State v. Hunt, 141 Mo. 637.

*Frank A. C. Macmanus* for respondent.

(1) Depositions can be taken to support the allegations and be used on a motion for a new trial. 14 Ency. Pl. and Prac. 903, last paragraph; Schoofield v. Bunton, 20 Colo. 139; Gano v. Wells, 36 Kan. 688; Erwin v. Ball, 29 Ind. 95; Krudenier v. Shields, 70 Iowa 428; Jones v. State, 89 Iowa 182; Winslow v. Morrill, 68 Mo. 362; People v. Gall, 149 N. Y. 106. (2) Prior to the passage of the law now in force, affidavits of jurors would not be received when objected to, to impeach their findings. Query: How about a majority verdict? Thompson & M. on Juries, 315; State v. Branstetter, 65 Mo. 149; State v. Alexander, 66 Mo. 148; State v. Underwood, 57 Mo. 40. (3) The reasons as given in this case by the trial judge were amply sufficient. It is the duty of trial courts to guard with jealous care the jury from outside influence, and when this juryman went home and found out ''it was the same case'' from the members of his family, the evidence he decided the case upon had not been presented to the court. Neither did the gentleman have a right to consult his wife about the case, unless he obtained the permission of court. Walker v. Walker, 11 Ga. 203; Walker v. Hunter, 17 Ga. 364; Madden v. State, 1 Kan. 340;

Knight v. Freeport, 13 Mass. 218; Allen v. Aldrich, 29 N. H. 63.   (4)  (a)  Notwithstanding the fact that in the case of Kennedy v. Holliday, 105 Mo. 24, a new trial of the cause was refused, this phase of our case is well discussed.   Also in Cilley v. Bartlett, 19 N. H. 312.   (b) The action of the juryman Heinze in relating to his fellow-jurors what he thought he knew about the case, was gross misconduct on his part obtained as it was. Vaughn v. Dodson, 2 Swan 348.   (c) It was equal misbehavior on the part of the entire jury to hearken to the recitals.   (d) The disqualification of a person to act as a juryman, if unknown can be taken advantage of after verdict.   State v. Weeden, 133 Mo. 70; Block v. State, 100 Ind. 137; Rhodes v. State, 128 Ind. 189; Jewel v. Jewel, 84 Me. 304; Mann v. Fairlee, 44 Vt. 672; Hester v. Chambers, 84 Mich. 562.   (e) Prejudicial remarks will impeach verdict, and when juror Heinze said, "I wanted to make it $10,000, but the others wouldn't stand for it, I had it in for him, anyway," etc., he showed his disqualifications.   Poole v. Railroad, 2 McCrary 251; Blolock v. Phillips, 38 Ga. 216; Jewesbury v. Sperry, 85 Ill. 56; State v. Allen, 89 Iowa 49; Walker v. Daily, 87 Iowa 375.   (f) But like other matters relating to the conduct of trials, this matter, we take it, must be regarded as resting in the sound discretion of the court, and only subject to revision and reversal in cases of manifest abuse.   Johnson v. Witt, 138 Mass. 479; Scott v. Smith, 133 Mo. 618; Rottman v. Smucker, 94 Mo. 143; Bank v. Wood, 124 Mo. 72; Hewitt v. Steele, 118 Mo. 463.   (5) To warrant reversal of an order for new trial, it must clearly appear that no error occurred that may possibly have been prejudicial to the party who applied for the new trial.   Ittner v. Hughes, 133 Mo. 693.

BLAND, P. J.—The suit was to recover damages for an alleged breach of contract of marriage, aggra-

vated by seduction under the promise, and birth of a child.

The answer was a general denial and a disclaimer of knowledge of the birth of a child or responsibility therefor.

Plaintiff offered evidence tending to prove the allegations of her petition, and the defendant offered evidence tending to support his answer. There was a verdict for plaintiff, assessing her damages at $3,500, which was set aside on motion for new trial and a new trial granted. From the order granting a new trial, plaintiff appealed. The new trial was granted on the ground of misconduct on the part of one of the jurymen (Chas. Heinze) in the juryroom after the jury had retired to consider of their verdict.

The learned trial judge handed down the following memorandum of his ruling on the motion:

"I feel bound to grant a new trial in this cause in order to maintain unimpaired the right of every litigant to have his or her case adjudicated before twelve impartial men.

"I have a very high regard for the right of trial by jury, and I realize the great importance of maintaining the system in its integrity.

"Every citizen who is called into court to have his rights determined by judicial proceeding ought to feel that he has had a fair, full and impartial hearing. And there should be no reasonable ground of complaint left to him at the end of the proceedings. Judicial proceeding should be free from even a semblance of suspicion.

"In this case it seems that one juror (Chas. Heinze) had heard the matters to be tried talked over before the trial (no doubt sometime before) but did not remember it when being examined as to his qualifications as a juror in the case, and therefore did not disclose the fact, and was accepted to try the cause. It seems that this came to him during the trial, and it is to be regretted

that he did not then disclose it; but he did not. And he is one of the nine jurors who rendered the verdict.

"I regret that it is necessary to set aside this verdict because, but for the facts above stated, the trial was, in my judgment, fair to both sides.

"The defendant will be required to pay all accrued costs, and the case will have an early setting, if the plaintiff desires it."

To prove the alleged misconduct the following affidavits were filed:

"My name is Joseph E. Sculley. I reside at 3120 Newstead avenue in this city, and was selected as a juryman in November, 1902, in circuit court room No. 5, of the St. Louis Circuit Court, and acted as such in the case of Meisch v. Sippy. While we, as jurymen, were in consultation with each other over the evidence of the cause, we were more or less interrupted by one of the jurors telling us that he knew all about this case; that his sister knew the plaintiff, and had told him all the facts concerning it, which facts he repeated in my presence to them. Mr. Heinze, the juryman mentioned above, particularly said to me that, 'I know this family, and she is a nice girl, and my sister has told me all about the case, but I did not know these were the same parties until I got home, and my people told me this was the same case, but I did not know this until after I was on the jury and heard some of the evidence, then, I knew it was the same case my sister had told me all about.' This was frequently repeated. I make this affidavit for the reason that I was called to the office of Mr. Macmanus and asked whether such a state of facts were true and on answering yes, he reduced the same to writing and asked me to sign it, which I now do.—Joseph E. Scully."

"My name is John J. Groves. I reside at 2316 N. Broadway, in the city of St. Louis, Missouri. I have lived all my life in this city, and I am acquainted with one Charles Heinze, who does business at Tenth and Chambers streets. I met him on the Third street mar-

ket almost daily, and have known him for at least six or seven years. I also knew he was a juryman on the Sippy case, for I heard him speaking about it on or about the 24th day of November, 1902, while I was on the market. I met Mr. Heinze in company with two other persons; I was buying right near them, and heard the following conversation: Heinze says to his companions: 'Last week I was in a better place than out here on the street.' On being asked where, he said, 'On a jury in the Sippy case. I was in a nice warm room there;' and on being asked, 'What kind of a case was you on?' Heinze said it was a breach of promise case. 'When I first went on the jury I didn't know I knew anything about it, but when I heard the evidence, pshaw! I knew the whole thing long before, for when she had him arrested down at the Four Courts summer before last, my sister told me the whole thing, and I always knew she was a nice girl.' Of course, there was more said than I have given; I can not use the exact language. Yes, I know Joseph Sippy, and have known him for a long time, but not familiarly. I voluntarily told him about having heard this conversation, because I thought if the speaker had such knowledge as he said he had, i¹ was not fair that he should act as a juryman, and I think so yet.—John J. Groves."

"My name is Henry Pins. I have lived in the northern part of St. Louis, Missouri, all my life, and for the last seven or eight years at 1409 Clinton street. I know Charles W. Heinze, who keeps a grocery store at the corner of Tenth and Chambers streets. I knew he was a juryman on the breach of promise case of Meisch v. Sippy, though I knew neither of the parties to the suit. My information came to me in this way: I am in the habit of dealing at his store and often drop in to the same for the purpose of buying tobacco. One evening I was in the store and Heinze was there talking to another man, I believe he had whiskers, anyway Heinze said, 'You bet we gave it to him, I wanted to

give him ten thousand but the other fellows would not stand for it; I had it in for him anyway on account of what I had heard about the matter.' This was said in such a manner as to attract my attention and listening further, I heard they were talking about a case that a girl living on Prairie avenue had brought suit against a sprinkling contractor for seducing her, and in the conversation Heinze said he had been on the jury, and had gone home in the evening and learned that his family knew the girl too; and after he had gotten on the jury, then he found out it was the same case that had been in the Four Courts about a year or so before that. I can't give the words as he said them. I give them as nearly as I can; in substance, Heinze was boasting to his friend that he gave a verdict in favor of the girl, because she was a friend of a friend of his; I clearly heard him say, 'I had it in for him anyway,' and he said he knew all about the matter beforehand; my attention was attracted by that remark—and I naturally thought that was a queer remark for a man who had been on the jury to make. Yes, I repeated this conversation the next day after I heard it. I know that the conversation I heard between those men was in November, because it was before I left the city to go hunting, but I can not say the exact day.—Henry Pins.''

''Defendant further says that his case was not tried by an impartial and unbiased jury, in this, that a member of said jury who signed the majority verdict was prejudiced against defendant, and had knowledge of the entire cause from plaintiff's side of the case prior to his being accepted as a juryman, and who, upon being questioned prior to being accepted as a juryman, as to said knowledge, falsely denied that he had known anything concerning the particular facts in said cause, and also denied on his *voir dire* that he had heard anything concerning the case at bar, and yet when debating the question in the jury room, as well as elsewhere, made the remark that he knew all about the cause, as his sister

was an intimate friend of plaintiff, and had told this said juryman the particulars of the whole transaction; that such jury improperly received this recital from the juryman, and were more or less influenced thereby against this defendant; that said juryman's name is Charles W. Heinze; that he admitted in the jury room, while advocating the interests of plaintiff, that he had conversed during the trial with members of his family regarding the case; this conduct was against the positive instructions of the court, and said juryman lives at No. 926 Tyler street, and does business at 1000 Chambers street. That he has endeavored to have the deposition of said juryman taken, but was stopped by the rulings of the commissioner and the judge of this court, so he presents such facts by the affidavits of Scully, Pins and Graves as part of this affidavit."

An attempt was also made to take the deposition of the juryman Heinze, but on account of objections that were interposed by plaintiff's counsel, nothing of any moment was elicited from him, except evidence tending to support the verdict.

In rebuttal the plaintiff filed the following affidavit:

"This affiant further states that she does not know and never did know any of the jurymen who sat upon the jury which tried her case, and that she never saw any of the said jury to her knowledge before the trial, and she particularly states that she does not know Mr. C. W. Heinze, and never saw him or heard of him before said trial; neither does she know any sister or relative of said C. W. Heinze, and is not an intimate friend of any sister or relative of said C. W. Heinze, and that she never heard of C. W. Heinze or his sister. —Amanda Meisch."

1.  It will be noted that Scully, one of the affiants, was one of the jurors. It is contended by the appellant that these affidavits were incompetent evidence to impeach the verdict of the jury and should have been disregarded by the court in passing on the motion for new

trial. If there is any rule of law more firmly established in this State than any other, it is that affidavits of jurors will not be heard for the purpose of impeaching their verdicts; that consideration of public policy forbids it. State v. Branstetter, 65 Mo. 149; Sawyer v. Railroad, 37 Mo. 240; State v. Alexander, 66 Mo. 148; McFarland v. Bellows, 49 Mo. 311; Phillips v. Stewart, 69 Mo. 149; State v. Dieckmann, 75 Mo. 570; State v. McNamara, 100 Mo. 100; State v. Palmer, 161 Mo. 152; State ex rel. Rogers v. Gage Bros. & Co., 52 Mo. App. 464; New York Store Mer. Co. v. Chapman, 89 Mo. App. 554. It is equally well settled, on grounds of public policy, that a verdict can not be impeached by the affidavits of outside parties to statements of the jurors made after their discharge. State v. Cooper, 85 Mo. 256; State v. Rush, 95 Mo. 199; State v. Schaeffer, 116 Mo. 96; Easley v. Railway, 113 Mo. 236; State v. Sprague, 149 Mo. 409; Proffer v. Miller, 69 Mo. App. 501; Herring v. Railroad, 80 Mo. App. 562. In view of these well-settled rules, the affidavits filed by respondent were wholly incompetent to impeach the verdict and should not have been considered.

It follows that the learned circuit judge was, in granting a new trial, influenced by evidence that he should have rejected and refused to consider, hence, the exercise of his discretion in granting a new trial, on the ground of misconduct of the jury, is unsupported by any competent evidence. We agree with him that the trial was fair to both sides and that the verdict should be permitted to stand, unless prejudicial error intervened at the trial, or unless a new trial should be granted on account of the newly-discovered evidence.

Respondent, in his brief, has referred to many alleged errors in the admission and rejection of evidence. An examination of the record fails to disclose any prejudicial error in the admission or rejection of evidence. It seems to us from the abstracts furnished us that respondent, in the examination of his witnesses and in

the cross-examination of plaintiff's witnesses, was allowed a wide field and a somewhat free hand and has no substantial ground to complain that he was not permitted to get before the jury all the competent and relevant evidence he had to offer.

The instructions given cover every issue made by the pleadings and are eminently fair.

Respondent's counsel comments fiercely on the evidence tending to impeach the character of the plaintiff for chastity and veracity. This feature of the evidence, we have no doubt, from the zeal he exhibits, counsel for respondent exploited for all it was worth before the jury, the proper tribunal to pass upon it. His appeal to us, to review the evidence and pass upon the plaintiff's credibility, is asking us to exercise a function that does not pertain to this court.

2. Another ground in the motion for a new trial which merits attention is that new evidence, favorable to the defense and material to the issues, was discovered after the trial. In support of this ground, respondent filed affidavits of himself and of William Veitch and wife, and of Dr. Fannie Thompson. The affidavit of William Veitch is as follows:

"My name is William Veitch and I reside with my wife and child at No. 1012 Taylor avenue, St. Louis city, Missouri. After the newspapers contained an account of the Sippy trial, my wife and I were conversing with reference to the account, and she told me she had been a friend of the girl, and she had related many things to her. Chancing to meet Mr. Sippy, I informed him regarding the evidence of my wife—we had never spoken of the affair before, and had I known that my wife was possessed of any information earlier, I should certainly have informed the parties, but I rarely meet any of them, and have no interest in the matter, and would not have known anything about this had I not accidentally discovered the matter at the time by the chance remark made by my wife. Prior to the trial I

did not know that my wife was acquainted with Miss Meisch.—Wm. Veitch.''

The affidavit of Mrs. William Veitch reads as follows:

''My name is Mrs. William Veitch and I live at No. 1012 North Taylor avenue, St. Louis, Missouri. I am living there with my husband and child, and I know Amanda Meisch in the neighborhood of two years. I met her first at Mrs. Smith's on Saturday after Thanksgiving, a year ago, viz., in 1901. Mrs. Smith lives at or in close proximity to No. 4215 North Second street, and is a fortune-teller. While there I met a woman, and in a general way she told me that her name was Amanda Meisch, and that she lived on Prairie avenue in this city. While waiting we became quite familiar in conversation, and she related to me her history. Among many things she asked me if I was acquainted with Mr. Sippy, and I told her yes; that I had met him and was well acquainted with his family and she said, 'I sued him for $10,000 for being the father of my child,' and then we talked about different things concerning the suit, and during the conversation she showed me a little silver heart with the initials of J. E. S. engraved upon it, and I said to her, 'Did Mr. Sippy give you this,' and she answered, 'No, he didn't exactly give it to me, but I wanted one and went and got this made at a jeweler's.' I can not distinctly remember whether she said the jeweler's was on Grand avenue, or Salisbury street. My best impression is that she said it was on Grand avenue, but at any rate she further said that another one just like it had been given to her by Bud Irwine, but she wanted one with J. E. S. on it. So she went to the jeweler's and got the one she then wore attached to her watch chain and was showing it to me, and she also stated that she had the initials J. E. S. engraved thereon. We sat there and talked for about three hours. She also said that Mr. Sippy had paid her her wages after Christmas before she left the house of his mother, and

of the $100 that she received from him at that time she had given forty dollars of it, after the baby was born, to a Gypsy fortune-teller for the purpose of having her call on Mr. Sippy's mother, and try and have her exert her influence to cause him to marry her afterwards. When leaving, she invited me to call at her house, No. 2976 Prairie avenue, giving me at the same time one of her father's cards, and inviting me to call and see the child. On the following Tuesday I called at her home and found her waiting for me. I remained the greater part of the afternoon and we conversed along the lines of our former conversation had at Mrs. Smith's, in fact she talked of little else, and she told me in this conversation that she was out one night while she was working at Sippy's and came home with a gentleman; that when she arrived in the house, Mr. Sippy was there and he had seen her, and told him 'that the gentleman was only one of my uncles.' She wished to know of me whether I thought the fact of her being out with this man would injure in the trial, and I then asked, 'Did you ever go with other men, and she said: 'Certainly I did, there was a gentleman in Okawville, Illinois, that desired to marry me, and I told Mr. Sippy of it while we were in Forest Park, and he told me it would be the best thing for me to do, to marry that fellow, but I told him that I did not want that man, that I wanted him; and he said, pshaw, girl, you had better marry when you get a chance, I am not the marrying kind, I'll never marry anyone.' After this we frequently went together, meeting down town, and going to different fortune-tellers. We mostly met at Nugent's dry goods store, and once went to lunch at Phil Moore's (or Mohr's) on Ninth and St. Charles streets, and once when I met her at Nugent's, the exact date I can not now remember, she said to me, in the presence of my sister, 'Now Rosa you are going to stick by me in this trial, are you not? If you do, I'll see that my father pays you well for it;' and I told her that I would not be a witness for anyone,

and she said, 'Well keep still, then, and don't tell Mr. Sippy what I have told you.' Once when we were talking over the subject, I said to her: 'How is it that a girl as old as you are, allowed the man to get the advantage of you before you were married to him;' and she said, 'Oh! he won't never marry anyone, he would always feel my legs and ask when I was going to give 'it' to him.' I frequently asked her, 'Didn't he ever give you anything or write to you,' and she as often said, 'No, he never gave me anything; his mother gave me a ring and some other little things, but I never had a scratch of a pen from him in my life.' She also said, 'He had a little diamond ring and I wanted it badly, but he would not give it to me;' and she said 'If I had only got that, my lawyer said I would be all right in my case; but, Oh! he was too sharp, he would not give it to me.' Once she also told me in the front parlor of the house that she was seven months in that condition before she knew it, and that she did not know it until she was told of it, by an examination made by Dr. Heine Marks, and when telling this she would say, but I did know it, and I first went to Dr. Heine Marks I told him I did not know who was the father of the child; and she would add, 'I wonder if that will have any effect on my case?' I once asked her why she didn't tell Sippy of it, and she said, 'Oh! I did not know I was in that condition for seven months, and I did not speak or see him from the time I left his mother's house until I saw him in the court room of the Four Courts.' I have never told anyone about these conversations with Amanda until my husband and I were talking about the verdict and the newspaper accounts, and then I told him about them. A few days after I told him I was brought down to the office. Of course, if I had known Mr. Sippy better I might have told him of them had I been questioned on the subject, but I never seen him. The whole thing is no affair of mine, and I have no interest in it.—Mrs. Rosa Veitch.''

Dr. Fannie Thompson was the attending physician of the appellant at the birth of the latter's child and was a witness for the respondent at the trial and testified in his behalf. Her affidavit, therefore, can not be looked to as furnishing any evidence of newly-discovered evidence. The excuse that she makes in her affidavit for not disclosing all she knew, is that she was intimidated by the harsh language of the presiding judge addressed to her when on the stand as a witness. This allegation is not supported by what appears in the abstract of her examination; on the contrary, it shows that this person, notwithstanding she was appellant's physician, was a willing witness for the respondent, so willing and eager was she to testify in his behalf and to divulge knowledge and information she had gained of appellant when attending her as her physician that the instructions and orders of the presiding judge were of little avail to stop her. The idea that she was intimidated, in view of what appears in the abstracts, seems to us incredible.

The affidavit of respondent sets forth the substance of the evidence of Mrs. Veitch and the other usual allegations as to diligence, etc., incorporated in affidavits for a like purpose. The affidavits of both Veitch and his wife show that diligence would not have discovered the evidence of Mrs. Veitch before the trial. Her evidence is very important to the defense; if true, it is also true that no contract of marriage was ever entered into between the appellant and respondent. Her affidavit bears the apparent marks of sincerity and truth, it is denied, however, by the affidavit of appellant. But Mrs. Veitch seems to be a disinterested witness and we think on an examination of the evidence as we find it in the abstract, that on account of the materiality of the evidence of Mrs. Veitch, as disclosed in her affidavit, justice will be subserved by a retrial of the cause. The order awarding the new trial is therefore affirmed. *Reyburn* and *Goode, JJ.*, concur in the result and in the reasoning of the second paragraph, but express no opinion on the

question of whether a juror's statement, that he had already formed an opinion before trial concerning the merits of the case, may be proven to show his disqualification and as ground for new trial.