State v. Underwood.

STATE OF MISSOURI, Respondent, *vs.* WESLEY UNDERWOOD, Appellant.

1. *Practice, criminal—Change of venue.*—Notwithstanding the provisions of the statute, (Wagn. Stat., p. 1098, § 27,) a second change of venue may be granted in a criminal cause when the judge has been of counsel therein. (See State vs. Gates, 20 Mo., 400.)

2. *Practice, criminal—Co-defendant, when may be first tried.*—Where facts and circumstances are shown which render it apparent that no verdict of "guilty" can be obtained against a co-defendant in a criminal prosecution, it is the practice to allow him to be first tried so that he may be a competent witness. Where the evidence against him is slight, the court may, in its discretion, submit his case at the close of the testimony for the prosecution.

3. *Criminal law—Murder, indictments for—Malice may be inferred.*—In indictments for murder, proof of willfulness and deliberation need not be express or positive, but may be deduced from all the facts attending the killing; and if the jury can reasonably and satisfactorily infer from all the evidence, the existence of the intention to kill and the malice of heart, it will be sufficient. But if malice and premeditation are not proved, the law presumes the killing to be murder in the second degree.

4. *Criminal law—Self defense.*—A person who seeks and brings on a difficulty cannot avail himself of the right of self defense in order to shield himself from the consequences of killing his adversary, however imminent the danger in which he may have found himself in the progress of the affray.

5. *Criminal law—Mutual combat—Murder.*—Where persons by mutual understanding engage in a conflict and death ensues to either, the slayer will be guilty of murder.

6. *Practice, criminal—Presence of prisoner when unnecessary.*—Every person indicted for a felony must be present during the trial, (Wagn. Stat. 1103, § 15); but the mere fact that a motion affecting his case is taken up and discussed in his absence, where no final action is had thereon, is not such error as will warrant a reversal.

7. *Jury—What facts influencing verdict may be shown.*—The rule is perfectly well settled, that jurymen cannot be allowed to disclose the fact of any partiality or misconduct which took place in the jury-room nor the motives which induced their verdict. But their affidavits showing that no disturbing influence was brought to bear upon them, and that they were not interfered or tampered with are properly received by the court.

### *Appeal from Marion Circuit Court.*

*W. M. Boulware & Jno. F. Williams,* for Appellant, cited: Hane vs. State, 4 Howard, (Miss.) 187; Com. vs. Roly, 12 Pick., 496; Com. vs. McCall, 1 Va. Cases, 271; McLain vs. State, 10 Yerg., 241; 13 Mass., 218; 2 N. H., 474; Boles vs.

State, 13 Sm. & M., 398; Jones vs. State, 2 Blackf., 479; McCann vs. State, 9 Sm. & M., 495; Lord Deleware's case, (4 Harg. St. trials, 232;) 3 Whart., 3089.

*Jno. H. Overall*, for Respondent.

I. The court properly gave the 8th instruction for the State.

II. The rule is now perfectly well settled both in England and in this country that the testimony of jurors is inadmissible to show their own misbehavior, but may be received to explain or contradict other evidence tending to impeach their verdict. (33 Mo., 71; 4 Johns., 487; 12 Pick, 520, 524, 525; 1 Greenlf. Ev., § 252; 107 Mass., 453—reviewing the whole question; 2 Grant, 41.)

WAGNER, Judge, delivered the opinion of the court.

This was an indictment for murder in the first degree found in the Ralls County Circuit Court against the defendant and six others for the killing of one Richard Menifee. The defendant was charged as principal in the first degree, and the others were charged as being present, aiding, abetting and assisting in the murder.

Upon the application of the defendants, a change of venue was granted·to the Circuit Court of Macon County and when the case was called for trial, a new judge having in the meantime been elected, who had previously been of counsel for defendants, a suggestion of that fact being made, the case was sent to Marion County, in another judicial Circuit, for trial.

When the case was called, the attorneys prosecuting for the State announced themselves ready for trial, and the defendant and Samuel Scobee, who was included in the indictment as a co-defendant, moved for a separate trial. Scobee asked that he might be first tried, and defendant demanded that Scobee should be first tried, alleging that he wanted the testimony of Scobee to be used on his trial. The Circuit attorney then moved that the defendant be first tried as he stood charged as principal in the first degree, and Scobee was only charged

with aiding and abetting. The court sustained this motion and ordered the prosecution to proceed against the defendant, and to this ruling exceptions were duly saved.

It seems that the difficulty between Menifee, the deceased, and the defendants in the indictment, had its origin in the removal of a fence which separated the farms of the respective parties. The true line was not accurately fixed, but enough was known to render it certain that the fence was placed upon the land of the Underwoods, the defendants. Menifee had built the fence and it belonged to him, and at the time the homicide was committed, he, with his brother, was in the act of removing it and putting it upon his own land. To this, defendants objected, as it would expose their crops. Defendant and Menifee had had some difficulty the evening before, and on the morning of the murder, Menifee brought a shot-gun with him when he went to his work in tearing down and re-building the fence.

The main witness for the prosecution was the brother of the deceased, who was assisting him at the time. He says that while they were staking off the line, he looked out and saw two men, defendant and Scobee, and when they saw witness and the deceased, defendant started towards them and then stopped and made a motion to Scobee to go west. Scobee got on his horse and went in that direction, and defendant went south towards Stephen Underwood's (his father's) house. The work continued, and in a short time Stephen Underwood came and he said to the deceased, that the boys were not going to let him move that fence. Deceased then said there was a legal way to stop them from moving the fence, and the old man said he would see as soon as he could get the boys and their arms. Stephen Underwood then went towards his house. Witness and deceased then went to another portion of the fence and commenced tearing it down, when, in about half an hour after Stephen Undewood left, he returned, and upon looking up, witness told his brother that he saw Stephen Underwood, William Underwood, Strother Underwood, Wesley Underwood, (defendant,) Frank Underwood, Asa

Underwood, and Samuel Scobee.   They were about a quarter
of a mile off when he first saw them.   Scobee and Strother
Underwood were coming from the west until they got to his
brother's fence and then they came up the fence.   Stephen and
Frank Underwood were coming up the fence from the south.
The other three were coming up about twenty steps from the
fence.   The old man ordered witness to stop tearing down the
fence, but he kept on.   They then had an altercation between
themselves.   Defendant, Wesley Underwood, started from the
edge of some plowed ground opposite Richard Menifee, the
deceased, with his gun presented towards him in a position to
shoot.   Richard then picked up his gun, both fired, the shots
were so near together that witness could not tell which fired
first.   Richard was shot and fell.   He then raised himself up
on his knees and shot again.   The Underwoods then ran
towards him and were shooting and beating him.   Witness
heard some three or four shots.   Some had sticks, some guns,
and some pistols; saw some three or four blows, could not tell
how many.   The deceased, after he was shot down was re-
peatedly struck with a gun on his breast, neck, and head, and
died in a short time thereafter.   The shots were mortal.   There
was no other eye witness on the part of the State, but there
was corroborative evidence as to the number of shots, etc.,
by those who were working in the immediate neighborhood.

William Colliver was a witness for the State, and he testi-
fied that he lived within less than a quarter of a mile of Ste-
phen Underwood, and he explained the situation of his farm
and the Underwood and Menifee farms and stated in his tes-
timony, that the Underwoods had joined on his fence without
his permission.   To this testimony, as to Underwoods join-
ing witness' fence without permission, defendant's counsel
objected and the court sustained the objection, but the evi-
dence was given in a narrative form and the remark was
made before the witness could be stopped.

For the defense, Mrs. Amanda Scobee, the wife of Samuel
Scobee and sister of defendant, stated that on the morning of
the murder she started out to the field, and saw her husband

and Strother Underwood riding in the direction of where
Menifee was tearing down the fence, and that she went on up
to the fence and was within thirty or forty yards of where
Menifee and defendant fought; that when she got there all
the defendants and Richard and John Menifee were there.
Richard and John were tearing down the fence. She then
speaks about the difficulty that took place between John
Menifee and her father, and after that Richard Menifee then
said, " there is Wesley, (defendant) and by God I will kill him
anyhow" and picked up his double-barreled shot-gun and
fired at Wesley as he picked up his gun. Strother said "for
God's sake Dick don't shoot." Dick shot Wesley, and Wes-
ley shot Dick. They fired two shots each, Dick was killed,
and Wesley was badly wounded and pulled open his shirt and
said he was killed. The witness then testifies that she and
her husband did what they could to administer to the comfort
of the deceased while he lived, and in the continuation of her
testimony she says, that Dick and Wesley each had a double-
barreled shot-gun; that there were four shots fired in all, and
that after the firing, Wesley and Dick came together and
clenched and fell. John Menifee then ran up and pulled Wes-
ley off from Dick. Wesley picked up a gun and turned on
John and struck him, and then turned on Dick and struck
him several times with the gun. Franklin Underwood,
another brother of the defendant, testified, that he had been
at home sick, and was in the house, when Wesley, the defend-
ant, came and got his gun, and said the Menifees were pull-
ing down the fence, and started off in that direction. Wit-
ness then put on his coat and followed after him, he saw the
whole encounter, and gives essentially the same version of it
that Mrs. Scobee does in her testimony. Some other evidence
was introduced which was unimportant. The defense then
offered to prove that Underwoods had joined their fence to
Menifee's with the latter's permission. This evidence was
objected to by the State and the objection sustained.

For the State the court gave twelve instructions, the sixth,
seventh and eighth are the ones objected to in this court.

The sixth instruction told the jury that if the defendant killed Menifee with a gun, loaded with powder and bullets, the law presumed the killing to have been intentional, and it was murder in the second degree in the absence of proof to the contrary, and that it devolved upon the defendant to show, from the evidence in the cause, to the reasonable satisfaction of the jury, that he was guilty of a less crime or acted in self defense.

By the seventh declaration the jury are instructed that if they believe, from the evidence, that Richard Menifee was engaged in pulling down his fence, and that the defendant came to where said Menifee was at work, armed with a loaded gun for the purpose of compelling said Menifee to desist from pulling down the fence by force, and approached said Menifee in such a manner as to give Menifee reasonable cause to apprehend a design on the part of defendant to kill him, or to do him some great bodily harm, unless he desisted from pulling down the fence, and there was reasonable cause to apprehend immediate danger of such design being accomplished, then the killing of said Menifee by defendant was not justifiable homicide.

The eighth instruction tells the jury that if they find from the evidence, that defendant and deceased had a difficulty which resulted in the death of the deceased, and that defendant commenced the difficulty, or brought it on by any willful and unlawful act of his committed at the time, or that he voluntarily and of his own free will and inclination entered into the difficulty, then there is no self defense in the cause and they should not acquit on that ground; and in such case it made no difference how imminent the peril might have been, in which the defendant was placed during the difficulty. There is a second instruction numbered six, which told the jury that if they should find, from the evidence, that Richard Menifee was engaged in pulling down his fence, and that Wesley Underwood came to where said Menifee was at work armed with a loaded gun, for the purpose of compelling said Menifee to desist from pulling down the fence by force, and approached said

Menifee with his gun held in a position to shoot, then the killing of said Menifee by said Wesley Underwood was not justifiable or excusable homicide. On the part of the defense, the court instructed the jury : First, that defendant had a right to carry his double-barreled shot-gun, and that if they found from the evidence, that whilst so carrying it, he made no threat, menace, or demonstration to shoot Richard Menifee, and if they should further find, that said Menifee, without being threatened by defendant, or menaced by him in any hostile manner whatever, picked up his gun and declared that he would kill defendant, and then and there presented his gun loaded with powder and bullets or shot at defendant, in a shooting position, then in such case defendant had a right to shoot said Menifee in self defense, and even to take his life in order to save his own ; secondly, that if the jury believed from the evidence, that defendant, at the time he shot and killed Richard Menifee, had reasonable cause to apprehend a design on the part of said Richard Menifee, to commit a felony upon him, or to do him some great personal injury, and that there was reasonable cause to apprehend immediate danger of such design being accomplished, then in such case, defendant had a right in defense of his own person to shoot and even to kill the said Richard Menifee, unless the defendant sought and provoked the difficulty ; thirdly, that defendant had a right to go either alone or with others to the point where Richard Menifee and his brother were tearing down the fence, for the purpose of remonstrating with them, in a peaceable manner, to dissuade them from pulling down the fence, and if the jury believed from the evidence, that whilst defendant or others were so engaged, in a peaceable manner remonstrating against the tearing away or removal of said fence, Richard Menifee picked up his gun loaded with powder and bullets or shot, declaring that he would kill defendant, and then and there presented his gun at defendant in a hostile manner, then defendant had a right, in the necessary defense of his own person, to shoot and kill the said Richard Menifee, and the jury ought to find a verdict of " not guilty."

The jury rendered a verdict of guilty of murder in the first degree, and it is to reverse the judgment entered thereon that this appeal is presented.

There is no merit in the point raised, that the second change of venue was improperly granted, and that the Circuit Court of Marion County had no jurisdiction.

Aside from the fact that no exceptions were taken to the order, the statute settles the question conclusively. The act in reference to criminal practice, (2 Wagn. Stat., p. 1097, § 15) provides that when any indictment or criminal prosecution shall be pending in any Circuit Court, the same shall be removed by the order of such court or the judge thereof, to the Circuit Court of some county in a different circuit, in either of the following cases: First, when the judge of the court in which such case is pending, is near of kin to the defendant, by blood or marriage; or, second, when the offense charged is alleged to have been committed against the person or property of such judge, or some person near of kin to him; or, third, when the judge is in any wise interested or prejudiced, or shall have been counsel in the cause. The 20th section of the same act declares that whenever it shall be within the knowledge of a court or judge, that facts exist which would entitle a defendant to the removal of any criminal cause, on his application, such court or judge may make an order for such removal, without any application by the party for that purpose. And although the 27th section says, that in no case shall a second removal of any cause be allowed, yet this court has decided that a second change of venue may be granted when the judge has been counsel in the cause, notwithstanding the above provision. (State vs. Gates, 20 Mo., 400.) It is true that in this last case, the judge who awarded the change of venue had been the prosecuting attorney, but that makes no difference, as the 15th section applies justly and properly to every judge, whether he has been counsel for either the plaintiff or defendant.

It is next insisted, that Scobee should have been first tried, in order that the defendant might have had his testimony

upon the trial. But upon this point there is nothing to show that the court exercised its discretion unsoundly. It is the practice in criminal cases, where a co-defendant has been included in the indictment by mistake, or facts and circumstances are shown, by which it is apparent that no verdict of guilty can be obtained against him, to allow him to be first tried, so that he may be restored to his rights as a witness. The exercise of this power is usually called forth where there is a joint trial. Where, in the case of a joint trial, the evidence in behalf of the prosecution is all in, and there is no testimony implicating one of the defendants, it is then the duty of the court to permit the verdict to be immediately taken, acquitting this one, and then he will be a competent witness for the rest. If there is some evidence, though slight, against the defendant whose testimony is thus desired by the others, the court may, in its discretion, submit his case to the jury at this stage of the trial; and if he is acquitted he will be a competent witness. (1 Bish. Crim. Proc., § 962; State vs. Roberts, 15 Mo., 28; Fitzgerald vs. The State, 14 Mo., 413.)

In this case the defendants were severed in the trial. No facts were brought to the attention of the court, which made it imperatively necessary to comply with defendant's or Scobee's demand, and the court simply exercised a discretion which we will not revise. Of course a person indicted as an accessory, or principal in the second degree, may be put upon his trial before the principal in the first degree is tried or convicted, but that question has nothing to do with the ruling of the court here.

The court very properly excluded the testimony tending to show that defendant joined his fence with that of the deceased by permission. No such issue was raised in the case, and if the permission had been granted, it would not have justified or excused the offense. The defendant had the right to remonstrate with the deceased against his act, whether the fence was joined by permission or not, but he had no right to resort to violence, in order to prevent its being torn down. Upon

this point, the court gave an instruction presenting the question in favor of the defendant, in the strongest light. The evidence of Colliver, about the defendant joining to his fence without leave, was not called out by the prosecution. The witness was giving his testimony in the narrative form, and used the remark before any objection was made. As soon as it was objected to, the court promptly ruled it out. It could not be withdrawn, for it was already uttered, and if the defendant considered that it was in any wise injurious to him, his counsel should have procured an instruction telling the jury to disregard it. The 6th instruction is the one most strongly objected to, and that, as before stated, told the jury that if the defendant killed Menifee with a gun loaded with powder and bullets, the law presumed the killing to have been intentional, and it was murder in the second degree, in the absence of proof to the contrary, and it devolved upon the defendant to show from the evidence in the cause, to the reasonable satisfaction of the jury, that he was guilty of a less crime, or acted in self-defense. It is difficult to perceive how this instruction could have injured the defendant, as the jury did not find him guilty of murder in the second degree, but they convicted him of a different and higher grade of offense, namely, murder in the first degree, upon an instruction which had previously been given, requiring them, before they could convict of that degree, to find that the killing was willful, deliberate and premeditated. But the instruction is unobjectionable. To constitute murder in the first degree, it is necesary that circumstances of willfullness and deliberation shall be proven. This proof, however, need not be express or positive. It may be deduced from all the facts attending the killing, and if the jury can reasonably and satisfactorily infer from all the evidence, the existence of the intention to kill, and the malice of heart with which it was done, it will be sufficient. But if circumstances of malice and premeditation are not proved, the law presumes the killing to be murder in the second degree only. This question was fully discussed in a quite recent case in this court, (State vs. Holmes, 54 Mo.,

153) and the settled doctrine in this State reviewed and re-iterated.

The 8th instruction is based on the well settled doctrine that a party who seeks and brings on a difficulty cannot avail himself of the right of self-defense, in order to shield himself from the consequences of killing his adversary, however imminent the danger in which he may have found himself in the progress of the affray. (State vs. Starr, 38 Mo., 270; State vs. Linney, 52 Mo., 40.)

The 9th instruction is predicated upon the hypothesis, that there was a mutual and voluntary combat. If that were so, defendant could not rely on self-defense. For, where parties by mutual understanding, engage in a conflict, and death ensues to either, the slayer will be guilty of murder.

The second instruction given for the defendant, being the first adverted to in a prior part of this opinion, gave the accused the full benefit of all he could claim in regard to the right of self defense. The third fully justified him if he acted on appearances, grounded on reasonable cause of apprehended danger, and was surely sufficiently favorable. And the fourth declares, that if, whilst defendant was remonstrating with Menifee against tearing down the fence, the latter picked up his gun, threatening to kill defendant, and presented the same at defendant in a hostile manner, then the defendant had the right, in the necessary defense of his person, to shoot and kill the deceased. When the instructions are all taken together, they lay down the law with such manifest fairness, and, withal are so just to the defendant, that it is impossible to find any real or tangible ground for complaint.

It is further contended that the defendant was not present in court during the whole progress of the trial, and therefore, the judgment is erroneous. Upon this point the record shows, that whilst the prisoner was in jail, the attention of the counsel in the cause was called by the court to the causes assigned for a new trial, and thereupon it was suggested by the prosecuting attorney, that the prisoner should be brought into court; the court then announced that it would not be neces-

sary, as no action would be taken on the motion at that time; but that the court, with a view of understanding the legal question, desired a reference to certain authorities relied on, and also the view of counsel thereon. Authorities were read and the counsel, both for the State and for the defendant, stated their views of the legal question involved in the absence of the defendant. The further hearing of the motion then passed over until another day, at which time the defendant was present, whereupon the motion was taken up, and after counsel on both sides had read the authorities relied on by them respectively, and submitted their views, the court overruled the motion. Every person indicted for a felony must be present during the trial, (2 Wagn. Stat., p. 1103, § 15) but here no step was taken in the trial during the defendant's absence. After the trial was over, the court requested the attorneys to furnish it with any authorities they might have, bearing on a legal question involved in the motion for a new trial, and also to state their views concerning the same ; but no farther action was taken ; no ruling was made, and nothing transpired having any reference to the progress of the trial. When the time arrived for the court to proceed with the determination of the motion, the defendant was present, the final argument was then made, and the court acted in his presence. This point must be ruled against the defendant.

One more objection only, remains to be noticed. It appears that before the case was given to the jury, and whilst they were still in the court room, two witnesses from Ralls county who were present on the part of the State, ascended to the cupola of the court house for the purpose of obtaining a view of the town. The stairs by which they went up, led from a door in one corner of the county clerk's office. Whilst they were on the court house, the jury were conducted by the sheriff into the county clerk's office, the room set apart for them, for consultation. The men, not knowing that the jury were there, descended in the same way that they had gone up, and then opened the door and passed immediately out of the room. The jury were in another corner of the room, and no

word of communication was had between the jury and the witnesses. These facts are abundantly established by the affidavits of the two men themselves, and by the sheriff and his deputy, and by several of the jurymen. Whilst I agree that any tampering with a jury, however slight, may be sufficient to set aside their verdict, the case here shows most conclusively, that there was neither tampering, misbehavior, nor any improper conduct whatever. These facts are perfectly evident without regard to the affidavits of the jurors. But I do not think that the court erred in receiving the affidavits of the jurors. The rule is perfectly settled, that jurors speak through their verdict, and they cannot be allowed to violate the secrets of the jury room, and tell of any partiality or misconduct that transpired there, nor speak of the motives which induced or operated to produce the verdict. But they may testify in support of their verdict, that no disturbing influence was brought to bear upon them, and that they were not interfered or tampered with. This question was elaborately considered, and all the leading authorities collated and reviewed in Woodward vs. Leavitt, (107 Mass., 453) and the doctrine was declared to be as above stated.

I think the court did not exercise its discretion unsoundly in refusing to sustain the motion in this respect. Upon an examination of the whole record, I have discovered no material error.

Judgment affirmed; the other judges concur.