STATE of Missouri ex rel. STATE HIGH-
WAY COMMISSION of Missouri,
Plaintiff-Respondent,

v.

BALLWIN PLAZA CORPORATION, a cor-
poration, et al., Defendants-Appellants.

No. 55854.

Supreme Court of Missouri,
Division No. 1.

Dec. 13, 1971.

Motion for Rehearing or to Transfer to
Court En Banc Denied Jan. 10, 1972.

Robert L. Hyder, Jefferson City, Edwin B. Brzezinski, Melvin Englehart, Kirkwood, for respondent.

Walter S. Berkman, Clayton, for defendants-appellants.

LAURANCE M. HYDE, Special Commissioner.

Condemnation action. Defendant was awarded $98,700.00 by commissioners and both parties filed exceptions. The jury's verdict was for $33,500.00 and judgment was entered against defendant for the excess received of $65,200.00. The lowest estimate of damages by defendant's witnesses was $224,000.00. Defendant has appealed from the judgment against it. We affirm.

This is the second appeal in this case, the first being reported in 382 S.W.2d 633, in which we reversed and remanded a judgment against defendant for $78,700.00 for error in an instruction given at plaintiff's request. Defendant says "an accurate description of the property involved is set out therein." We therefore adopt the following statement of facts from that opinion.

"This action was instituted October 21, 1960, to acquire a part of defendant's land which abutted the north side of Route 100 (Manchester Road) in Ballwin, Missouri. This, together with other lands in the area, was being appropriated for the purpose of widening said Manchester Road between Manchester and Ellisville for a distance of about eight miles. The land taken from defendant was a strip 30 feet wide across the entire 883.10 feet of frontage containing 26,572 square feet. The defendant owned a 'community shopping center' at the location in question, and the area taken was intended for parking. The date of taking was stipulated as April 25, 1961.

"Route 100, or Manchester Road, runs generally east and west through St. Louis County. It was a 2-lane concrete roadway prior to the taking in question with each lane being nine feet in width. Access along defendant's entire frontage was not limited before, or by, the taking. Prior to the taking defendant was permitted by the state highway commission to utilize its right of access via four entrances constructed along the north side of the road and ranging in width from 41 to 49.3 feet. The construction plans filed in connection with the condemnation petition provided for replacement of such entrances at approximately the same locations, all to be 50 feet wide. The planned construction would cause Manchester Road to become two lanes 12½ feet wide in each direction with a 10-foot shoulder on each side of the roadway. The shoulder was to be of oiled aggregate, a 'stabilized shoulder,' and by its use turning angles at the entrances would be wider. The road as thus changed was intended for vehicular travel at 40 miles per hour and the purpose of the changes was 'to move traffic through the area in a more efficient manner.'

"Defendant's shopping center consisted of various store buildings constructed in a 'U'. The buildings contained approximately 155,000 square feet of floor space. The land taken was intended to provide 82 parking places [81 according to the present record]. The parking area remaining after the taking provided 967 parking spaces [997 according to the present record]. Although disputed by plaintiff, defendant produced testimony tending to show that this shopping center was short of parking space before the taking and therefore damaged by the loss of parking space. In an attempt to mitigate damages defendant purchased three adjacent tracts for replacement of the lost parking area." However, these tracts were never used for parking, because not conveniently located to the buildings according to defendant's evidence. Instead a Goodyear Tire Store was built there, which added another business establishment on one side of the original buildings.

The 30-foot strip taken had about the same area as a football field. Plaintiff had the cars parked at defendant's shopping center counted on weekends and holidays at various times. In 1961, the highest number counted was on Saturday, December 23rd, 483. In December 1962, the highest number counted was 531 on Saturday the 22nd at 3:00 P.M. In 1965, the highest number counted was 595 on Saturday, December 18th, at 4:00 P.M. Two witnesses, who were employed by the W. T. Grant Department Store in the shopping center, nine and ten years, testified there was always room to park. Each drove her car to work and parked there. There were promotion days at the center when it was crowded but "they have always found a place to park." Defendant had photographs showing crowded conditions on some of those days. Defendant also had testimony to show that if customers could not see vacant spaces they would not come in.

Defendant's first claim of error is the court's refusal of its offer to show that the shopping center was sold in September 1967 for $2,050,000.00. The court's refusal was on two grounds: (1) that the sale was too remote, the sale being more than six years after the 30-foot strip was taken; (2) the sale price was $450,000.00 less than the total cost of the shopping center while the estimate of damages by defendant's owner was $300,000.00. The court said "This, in and of itself, demonstrates that there were other factors involved in the difference in the value of the property between 1961 and 1967, because there is 50 per cent more loss from some other factor." It appears in the evidence that since 1961, although the area was growing, other competing facilities have been installed in the area including two other shopping centers. Plaintiff also had testimony that "It lacks one thing that makes a great shopping center and that is a crossroads."

It is said in 5 Nichols on Eminent Domain 21–13: "It is within the sound discretion of the trial court to admit or exclude tes-timony as to purchase price paid by owner of the property taken in a condemnation proceeding. It has been also held that where there is a resale after a partial taking of the remainder, under proper circumstances the price paid is admissible as evidence of the after value. The test of admissibility is, ultimately, whether the sale has probative value with respect to the present value. This determination lies in the sound discretion of the trial court."

Defendant strongly relies on Land Clearance Authority v. Doerenhoefer, Mo.Sup., 404 S.W.2d 385, in which evidence was received to show the purchase price of property nine years before it was taken. This was a four to three decision of the Court en Banc, dissent being on the grounds that remoteness and changes in the area since the purchase made the purchase price inadmissible. In that case, the property was purchased for $40,000.00. The whole property was taken and the value found by the jury was $55,000.00. The owner's evidence of value was $79,022. Plaintiff's evidence of value was $50,000.00. What the court really decided was: "The trial court did not abuse its discretion in permitting the jury to consider this evidence." Necessarily the dissents considered there was an abuse of discretion because of remoteness and changes in the area.

The other cases cited by defendant are State ex rel. State Highway Commission v. Bowling, Mo.Sup., 414 S.W.2d 551, and State ex rel. State Highway Commission v. Langley, Mo.Sup., 422 S.W.2d 309. Defendant quotes from the dissenting opinion in Bowling, which was also a four to three decision of the Court en Banc, which discusses the decision in Doerenhoefer. However, Bowling involved the admissibility of an executory contract for the sale of a comparable property made in 1965 with a closing date in 1971. The court held this evidence was properly excluded because the date of closing was six years after the date of the contract and eight years after the date of taking. It was considered that such evidence "would inject such

elements of speculation and conjecture as to confuse the issue and mislead the jury." The view of the dissenting opinion was that "this was a currently executed, binding, written contract to sell and buy"; that "there is nothing to indicate that the parties are speculating as to a future value"; and that "they simply provided a deferred method of payment and closing." The writer of the dissenting opinion referred to the opinion in Land Clearance Authority v. Doerenhoefer, from which he dissented as recognizing that the time element and change of conditions were "things which the court recognized would go to the weight of the evidence in its consideration by the jury."

In State ex rel. State Highway Commission v. Langley, 422 S.W.2d 309, this court reversed and remanded because the trial court refused evidence of the amount of revenue stamps defendant put on his deed offered to show consideration involved in the sale of the land to transfer it to a family corporation six months before the taking. Thus there was no issue as to the time element but only as to this method of showing consideration. Defendant refers to the reference in the opinion to State ex rel. State Highway Commission v. Ogle, Mo.App., 402 S.W.2d 605, 610 which said "evidence which is legally competent, relevant and material on the issue of market value is admissible, and should not be excluded; and unless the evidence is wholly lacking in probative value, the weight to be given it, including remoteness and change of circumstances from the date of taking to the date of sale, is for the jury under appropriate instructions." However, it was also said in Ogle, 402 S.W.2d 1. c. 610: "Logically, the same rules should apply where there is resale of property after a part has been appropriated in such a proceeding. There, of course, may be situations where evidence of such sale price would not be competent. The condition of the property might have so changed, or economic conditions affecting values might be so different as to render testimony of the resale price of no probative effect as evidence of value as of the time of taking. But whether the tests of admissibility have been substantially met, rest to a large extent in the sound discretion of the trial court."

■ Our view is that the trial court did not abuse its discretion in refusing evidence of the sale price received for the shopping center more than six years later because the testimony of defendant's owner shows such a large part of the difference between cost and sale price must have been due to some other factors than the taking of a 30-foot strip off the parking area of its shopping center.

■ Defendant claims error in striking, and instructing the jury to disregard, the opinion testimony of its expert witness Turley that the value of the shopping center after taking the 30-foot strip was $1,800,000.00. The value to be considered as the court instructed was "the difference between the fair market value of defendant's whole property immediately before the taking on April 25, 1961 and the value of defendant's remaining property immediately after such taking." The shopping center had been open only a short time before April 25, 1961 and the amount of rents for the first year were $165,131.00. However, defendant's evidence was that there were several vacancies at that time and that a shopping center does not obtain its potential for five years. Defendant's witnesses explained that in addition to minimum guaranteed rent the leases provided for additional percentage rentals, based on sales, averaging 4%. Defendant's owner estimated damages, for loss of 81 parking spaces, on the basis that each space would promote $10,000.00 sales per year, so it claimed a total of $810,000.00 lost sales, 4% of which would be $32,400.00. He said capitalized at 9½% this would make total severance damages of $336,000.00. (The capitalization of other witnesses was on the basis of 7½%.) However, defendant's owner's testimony estimated severance damages at $285,000.00 and value of land taken (at 60 cents per square foot) $15,000.-

00, a total of $300,000.00 The court ruled the capitalization method was permissible even though only a 30-foot strip was taken, being of the view that Shelby County R-IV School District v. Herman, Mo.Sup., 392 S.W.2d 609, 614 [10], was not applicable to urban areas. Other defendant's witnesses gave the following estimates, all based on capitalization of income method of appraisal:

Martin: damages $224,000.00. Value before taking $2,110,000.00. Value after taking $1,886,000.00.

Vorhof: damages $341,000.00. Value before taking $2,533,844.00. Value after taking $2,192,833.00.

Hardesty: damages $325,000.00. Value before taking $2,325,000.00. Value after taking $2,000,000.00.

Plaintiff's witnesses' estimates of damages ranged from $11,425.00 to $23,500.00.

Mr. Turley testified to a value before taking of $2,121,000.00 and a value after taking of $1,800,000.00. When he made these estimates he said: "I based my appraisal on my judgment of the stabilized rent." He said: "Stabilized income is what the appraiser's judgment is what should be or could be produced." Turley used this method for his estimate of the value before taking. However, later in his testimony as to the value after taking, he said he used the actual rate of rents received which was different from the rate he used to compute the value before taking. Objection to this was sustained and Turley's statement as to the amount of the value after taking afterwards stated based on this method was stricken. No explanation of the reason for using different methods of computing before and after taking values was given. Defendant's brief says at the time of the present trial "the witness knew what the annual rental figures from 1961 to September 1967 actually were" and "It was proper for him to use the projected and anticipated income and such actual rental figures as a basis for his valuations before

and after the taking based on the income appraisal approach." This does not explain any reason for using different rates for before and after values.

Plaintiff says: "At the time Mr. Turley attempted to give his opinion as to the after value of the property based on the income approach, there was nothing in evidence to indicate the actual rate of return on the rentable area for the five-year period after the taking." Plaintiff also points out that no offer of proof was made showing the purpose and object of the testimony sought to be introduced and all facts necessary to establish its admissibility, citing Eickmann v. St. Louis Public Service Co., Mo.Sup., 323 S.W.2d 802, 810; stating this is essential to preserve such a ruling for appellate review. Plaintiff further says Mr. Turley's previous testimony that defendant's damages were $321,000.00 was never stricken and points out that it was only cumulative testimony, referring to the cases in West's Missouri Digest, Trial, § 56. We find no prejudicial error in the court's action concerning Mr. Turley's estimate at the conclusion of his testimony made on a different basis from his other estimate of value.

■ Defendants claim error in permitting plaintiff's counsel during final argument to argue to the jury that the damages to be awarded would be paid by Missouri citizens and taxpayers, citing Huggins v. City of Hannibal, Mo.App., 280 S.W. 74; Amsinger v. Najim, 335 Mo. 528, 73 S.W.2d 214; Jones v. Kansas City, Mo. Sup., 76 S.W.2d 340; St. Louis Housing Authority v. Barnes, Mo.Sup., 375 S.W.2d 144. Plaintiff's argument and the objection was as follows:

"Mr. Englehart: When we ask this expert to calculate it, this is as far as he could get and he quit. Now, I call that to your attention because, under the instructions of the Court, you are to determine the damages as of April 25 of '61 and that is what the people of this State should pay for and not what some-

body thinks it is going to be five years or so, any number of years after that. Mr. Berkman: Your Honor, I object to this constant reference to the people of Missouri paying for it. That is not true.

The Court: Overruled.

Mr. Berkman: It is prejudicial.

The Court: Overruled, this is argument."

Defendant in his previous argument had stated: "You know, the great State of Missouri is suing us and it is a sovereign state and we are subjects of that State, you and me. And I believe it is the sovereign State's duty to treat the subjects fairly * * * We don't have the money and where with all and power the State of Missouri does."

Plaintiff had previously in his answering argument said: "Now here gentlemen, they are asking the State of Missouri * * and we are all a part of the State, to pay this man all the way from $224,000 to $300,000 for what?" Defendant at that time made no objection.

Plaintiff never mentioned taxpayers in its argument to the jury and the way any reference to taxpayers got in the record was in defendant's counsel's cross-examination of Mrs. Reynolds, one of the clerks in the Grant store who testified concerning adequacy of parking space. After saying she supposed the Highway Department had subpoenaed her, her cross-examination continued as follows:

"Q. Are they going to pay you for coming here?

A. I didn't ask.

Q. Don't you have an understanding about it?

A. I am a taxpayer. I assumed it was my responsibility. It is my taxes help pay for these roads. I offered to, yes."

Defendant did not ask to have this testimony stricken.

Defendant relies most strongly on Huggins v. City of Hannibal. Plaintiff therein was injured by falling at night on a defective unlighted street crossing. Defendant's counsel argued "that the taxpayers of the city of Hannibal would have to go into their pockets and pay the plaintiff any award or judgment that might be rendered in her favor, and that any verdict rendered by the jury would be taking the taxpayers' money." The court not only overruled plaintiff's objection but also stated that such argument was proper. 280 S.W. 1. c. 75. The appellate court held this was prejudicial error.

In Jones v. Kansas City, the trial court ordered a new trial because of prejudicial argument about future cases that might be brought against the city if plaintiff recovered damages. 76 S.W.2d 1. c. 341. In St. Louis Housing Authority v. Barnes, the trial court sustained an objection to argument about preventing the use of taxpayers' money to pay more than property being taken was worth. 375 S.W. 2d 1. c. 148. We held the court's refusal to grant a new trial was not an abuse of discretion. Amsinger v. Najim is cited as showing that "counsel may not make an unfair, misleading, and prejudicial argument on immaterial facts which happen to get into the record without objection." 73 S.W.2d 1. c. 215. However, as noted plaintiff's counsel did not use the term "taxpayers" in his argument; and it seems that the term "people of this State" was not used in a personalized sense but would be understood to mean the same as the "State of Missouri" which term was also used by both counsel, and which defendant's counsel said included them all. While we consider it better to use only the latter term, we do not believe the jury would understand the term "people of this State," in the context of this case, to mean that any damages allowed would come from individual taxpayers as was argued in the City of Hannibal case. Furthermore, the State's

## 848

own witnesses testified to substantial amounts of damages that should be paid to defendant. Under all these circumstances we do not find prejudicial error in the court's ruling on defendant's objection and reminding the jury that it was argument.

■ Defendant's final claim is based on misconduct of jurors in considering matters outside the record and in disregard of the instructions. The court permitted the testimony of three jurors to be put on the record but said he considered it "improper and not permissible under the law of the State of Missouri." The testimony of these jurors was that members of the jury discussed whether Mr. Kahn, the owner and builder of the shopping center knew, must have known or should have anticipated, at the time he planned and built the shopping center, that the highway would be widened and a part of his parking area would be taken. We have considered many times this question of receiving testimony of jurors to impeach the verdict of the jury. In two recent cases, Helfrick v. Taylor, Mo.Sup., 440 S.W.2d 940, 946; McDaniel v. Lovelace, Mo.Sup., 439 S.W.2d 906, 909, we have restated and approved the ruling in Reich v. Thompson, 346 Mo. 577, 142 S.W.2d 486, 492, that "a 'juror will not be heard to impeach' his and the jury's verdict, either as to conduct inside or outside the jury room, either before or after their discharge." State v. Ferguson, 353 Mo. 46, 182 S.W.2d 38, 1. c. 45. See also Missouri citations, 8 Wigmore on Evidence 707; 58 A.L.R.2d 561. We adhere to this firmly established rule of public policy and hold there was no error in overruling plaintiff's motion for new trial.

The judgment is affirmed.

PER CURIAM:

The foregoing opinion by LAURANCE M. HYDE, Special Commissioner, is adopted as the opinion of the court.

All of the Judges concur.