Kenneth W. SHEARIN, Appellant,

v.

FLETCHER/MAYO/ASSOCIATES,
INC., Respondent.

No. WD 35150.

Missouri Court of Appeals,
Western District.

Dec. 18, 1984.

Kranitz & Kranitz, P.C., St. Joseph, for appellant.

R. Dan Boulware, Watkins, Boulware, Lucas & Miner, St. Joseph, for respondent.

Before CLARK, P.J., and DIXON and LOWENSTEIN, JJ.

LOWENSTEIN, Judge.

This is the second appeal for this breach of an employment contract case. The first trial resulted in a jury verdict for Shearin,

the plaintiff. Fletcher/Mayo, the defendant appealed and the case was remanded for a new trial because of instructional error. *See Shearin v. Fletcher/Mayo/Associates, Inc.*, 647 S.W.2d 127 (Mo.App.1983). The judgment on the second jury verdict, this time for the defendant, Fletcher/Mayo, is now appealed by Shearin. For this opinion abbreviated facts are set out. For more detail see *Shearin* I, *supra.*

After some negotiations, Fletcher/Mayo, an advertising agency, successfully recruited Shearin to move from Ohio to St. Joseph, Missouri to be a Vice President and Creative/Marketing Director of their advertising department. The subsequent suit dealt with an employment contract requested by Shearin and drafted by Fletcher/Mayo. The original contract had a three year term of employment, but also contained a clause that allowed the agreement to be terminated by either party at any time for justifiable cause.

There was some conflicting evidence as to how and when Shearin returned the contract, which had been pre-signed by Fletcher/Mayo, but when he did, Shearin had changed the termination clause to in effect give himself a three year non-terminable contract of employment. Shearin had signed the contract and initialed the change. Fletcher/Mayo never initialed the change but put the altered contract into Shearin's employment file. After working for ten months Shearin was terminated because he was not working well with other departments and because of management's dissatisfaction with his performance. The ultimate issue for the jury was whether or not a contract or obligation existed giving Shearin a cause of action for damages for the portion of the three years he could not work.

 Shearin's first point concerns the form of certain questions asked by Fletcher/Mayo of its own witnesses. Although a substantial question exists as to the timeliness and specificity of objections, without preservation this court will assume that Shearin preserved this question on appeal by timely objection at trial. Shearin cites *Holliman v. Cabanne*, 43 Mo. 568, 570 (1869) for the proposition that witnesses should not be permitted to give their opinions upon the truth of statements by other witnesses; as an example, counsel for Fletcher/Mayo in questioning its president said that Mr. Shearin had stated the reason for his discharge was due to the egotistical concerns of Mr. Mayo and asked Fletcher if he felt that were true. However, the *Holliman* court went on to say that witnesses "may do the same thing in effect by denying the fact stated." It is also interesting that the Missouri Supreme Court did not reverse the trial court's decision to let a witness answer whether a previous witness's statement was true or not. Instead the court held that the question was simply informal, and its answer could not have materially affected the case.

The other two cases cited for this proposition, *Henson v. Kansas City*, 277 Mo. 443, 210 S.W. 13, 17 (1919), and *Eickmann v. St. Louis Public Service Co.*, 363 Mo. 651, 253 S.W.2d 122 (1952) both dealt with expert medical witnesses. Not only are these cases not on point since the present case dealt with lay witnesses, but the law has changed since *Henson*. Even the *Eickmann* case held that "the province of the jury is to hear all evidence including opinion evidence, to weigh it all, and to decide the issues."

When Shearin first objected to the form of the question, the trial court instructed defense counsel to form his questions as hypotheticals. Shearin argues that this form was still improper, but cites no cases in support of that contention. The ultimate decision the jury had to make in this case was whether Shearin or Fletcher/Mayo was telling the truth about dealings with the employment contract. The jury can weigh the believability of witnesses' opinions. The form of the question as a hypothetical did not materially affect this case. The request for relief under Shearin's first point is denied.

Shearin's second point which contains several arguments, and covers one full

page in his brief is difficult to follow. Further complicating the matter is his discussion of still another argument within the argument portion. What seems to be the real matter alleged as error is the inclusion of Fletcher/Mayo's converse, No. 5, as a tail to Shearin's verdict director, No. 4 which reads as follows:

## INSTRUCTION NO. 4

Your verdict must be for plaintiff if you believe:

First, plaintiff and defendant entered into an agreement whereby plaintiff agreed to become an employee as vice-president of defendant and to perform the duties of Creative/Marketing Director for an initial employment term of three years at an annual salary of $37,-500.00, beginning 16 April 1979; the agreement could not be terminated during the initial three-year term; and defendant agreed to employ plaintiff according to those terms; and

Second, defendant accepted the agreement in the terms outlined in paragraph First above; and

Third, plaintiff performed his agreement; and

Fourth, defendant failed to perform its agreement; and

Fifth, plaintiff was thereby damaged unless you believe Plaintiff is not entitled to recover by reason of Instruction No. 5.

## INSTRUCTION NO. 5

Your verdict must be for the Defendant if you believe the Defendant, by Rod Fletcher and/or Glenn Mayo, told the Plaintiff that the Defendant was not agreeable to the change made by the Plaintiff to Paragraph 7 of the alleged Employment Contract.

He says the evidence showed acts of the company as amounting to an estoppel, (letting him come to St. Joseph, starting work and electing him a vice-president) so the company's converse about telling Shearin it could not accept the new termination clause really did not converse the elements of his

case. The problem with this argument is the case was pleaded and the jury was instructed on whether there was a contract between the parties. This is borne out by an affidavit of a juror which gave rise to the unusual twist in point 5, *infra*, that says the jury was trying to decide, "whether the 'contract' was a contract."

With regard to the question of the doctrine of estoppel, this court did say in *Shearin I*, 647 S.W.2d at 129 the jury could find that estoppel would apply under the facts. But it was the responsibility of Shearin to plead that theory in the second trial. Shearin claims that the following language of paragraph II of his second amended petition specifically pleads estoppel:

That on or about 16 April 1979, plaintiff was employed in the position of Vice-President and Creative Director of defendant, under written contract, copy of which is attached hereto and a part hereof by reference; that in such capacity, plaintiff faithfully served defendant and its best interests, and promoted the business of defendant to the exclusion of 11 other interests; and that defendant accepted the benefits of such contract and the labor of plaintiff.

In *Patterson v. State Board of Optometry*, 668 S.W.2d 240, 243 (Mo.App. 1984) the court set out the three elements necessary for the doctrine of estoppel: 1) an admission, statement, or act inconsistent with a claim afterward asserted and sued upon, 2) action by the reliant party on faith of such admission, statement or act, and 3) injury to the reliant party resulting from allowing the first party to contradict or repudiate such admission, statement or act. Even reading Shearin's petition in a light most favorable to him, those elements are not evident. Since Shearin failed to affirmatively plead estoppel, he cannot assert the doctrine at this time.

The second issue under Point II is whether Fletcher/Mayo's Jury Instruction No. 5 (set out *supra*) met the elements of an affirmative defense as required by MAI 33.01, and hypothesized an ultimate issue which would defeat Shearin's claim.

■ Since Shearin did not plead estoppel, this court need only be concerned with the elements of a valid contract. Instruction No. 5 addresses the ultimate issue of whether Fletcher/Mayo rejected the counteroffer made by Shearin when he changed the language of the contract. Shearin contends that the ultimate issue is whether he *understood* that by changing the contract he had in fact rejected the original offer, and was thus working without a formal contract. It is basic that everyone is conclusively presumed to know the law, so it is presumed that Shearin knew the effect of his changing the contract. The Missouri Supreme Court aptly discussed this in *Poe v. Illinois Central R. Co.,* 339 Mo. 1025, 99 S.W.2d 82, 89 (1936), when it said:

> [T]he law does not read the *ignorant* and unwary out of the pale of its protecting and remedial influence; but the practical administration of justice has rendered it expedient to set up certain standards, and the law, which everyone is conclusively presumed to know, although the courts themselves often experience considerable difficulty and labor in finally determining what the law of a given case is, recognizes established principles of conduct governing men in their commercial transactions.

Shearin's contention is therefore unfounded and Instruction No. 5 was properly submitted to the jury.

■ Shearin's third point concerns Jury Instruction No. 4. He claims this verdict directing instruction should not have contained a "tail" which told the jury if it believed Instruction No. 5 it must find for the defendant. Shearin points to MAI 33.01 which says "there is no requirement" that this tail be used for affirmative converses. This language does not lead to a per se reversal if a tail is included. These tails are not meant to emphasize the defendant's case. They are for the benefit of the jury to indicate which instructions should be considered together. While there is a technical difference between an affirmative defense and an affirmative converse, (the former is a new matter separately pled by the defendant, which if true constitutes a defense, while the latter is an hypothesized ultimate issue, which if true defeats the plaintiff's claim) if the jury believes either proposition, the result is the same—they must find for the defendant. This court does not find reversible error in the inclusion of the tail.

■ Shearin's fourth point is that there was sufficient evidence at trial to submit the question of punitive damages to the jury. For breach of contract cases, punitive damages are not allowed except where the breach amounts to an independent willful tort and there is evidence of malice, wontonness or oppression. *Greening v. Klamen,* 652 S.W.2d 730 (Mo.App.1983); *Wallick v. First State Bank of Farmington,* 532 S.W.2d 520, 524 (Mo.App.1976). Shearin points to four instances constituting substantial malice of actual or legal malice: 1) Fletcher/Mayo told employee witnesses that an award to Shearin was money out of their pockets, 2) Shearin was paid less in the repurchase of his shares than he was initially required to pay out as "punishment for his activities," 3) letter of reference used "buzz words" to tip off prospective employers to call the company to get the "real" story, 4) three vice-presidents conspired to get rid of Shearin.

■ The first three instances concern acts that occurred *after* Shearin's termination. This court must view this evidence in a light most favorable to the plaintiff giving him the benefit of all reasonable inferences to be drawn therefrom. *Smith v. Allied Super Markets, Inc.,* 524 S.W.2d 848, 849 (Mo. banc 1975); *Bandag of Springfield, Inc. v. Bandag, Inc.,* 662 S.W.2d 546, 551 (Mo.App.1983). Even assuming that those later acts reflect an earlier intent, this evidence taken as a whole does not rise to the level of being substantial evidence which is necessary to support a submission of an issue to the jury. *Id.*

The fifth point of Shearin's lumps three separate arguments which for here for the sake of clarity are titled Jury or Official Misconduct. These preliminary facts are in order. The court's sworn deputy clerk,

Alicia Smith, although not sworn as a bailiff, acted as bailiff for the trial. The day following the verdict (signed by 9 jurors) one juror sent a letter to plaintiff's counsel. The letter stated the lady (Smith) who served as bailiff entered the jury room sometime after deliberations had begun and while making coffee, jokingly said to the jurors, words to the effect "they should hurry up and settle the decision because it was getting close to 5:00 o'clock and she and the rest of us wanted to get home." The juror wrote this may have amounted to an undue influence changing the 7–5 vote for defendant to, within 10 minutes, the 9–3 result. With the agreement of Fletcher/Mayo a hearing on Shearin's motion for new trial was held at which evidence was taken from Smith and most of the jurors about what was said and done in the jury room after Smith's comments. During this hearing several jurors said they knew how they were going to vote when they went to the jury room.

Shearin first contends error and asks for a reversal on the basis Smith was not a sheriff nor a deputy nor sworn as bailiff therefore jury should not have been entrusted to her. The trial court said Smith (a duly sworn and acting deputy clerk of the division) was used instead of a deputy sheriff as an economy measure to save the time and expense of requiring a deputy to act as bailiff when an officer of the court was available. Shearin admits no Missouri statute exists governing bailiffs in civil cases.

▇▇▇▇ The cases relied upon by Shearin, *State v. Crockett*, 90 Mo. 37, 1 S.W. 753 (1886) and *Orscheln v. Scott*, 79 Mo. App. 534 (1899), pertain to the disqualification of the sheriff in summoning an impartial venire under the then jury statutes, and do not aid his point. Despite the lack of cases and absence of a statute on the subject, it is within the power of the trial court, as here, to appoint an elisor to act as bailiff and take charge of a jury retiring to obtain a verdict. In a civil case the elisor need not be the sheriff, a deputy or the coroner. The appointment of court personnel to such duties as acting as bailiff is highly preferable.

▇▇▇▇ That Ms. Smith did not take an oath as bailiff should not cause a new trial to be granted. The usual practice would be to administer an oath to the officer in charge of the jury, but, absent statutory provision, the failure of the court to administer an oath does not mandate reversal. *Deranleau v. Jandt*, 37 Neb. 532, 56 N.W. 299, 300 (1893); *Boreham v. Byrne*, 83 Cal. 23, 23 P. 212, 214 (1890). *Cf. Harris v. State*, 233 Ala. 196, 172 So. 347, 348 (1936). Further, it does not appear the plaintiff was prejudiced by the failure to administer an oath to the officer. *Deranleau, supra,* 56 N.W. at 300.

The plaintiff's next argument that the uttered remarks of Smith to the jury while in the jury room "were or appeared to be prejudicial to the deliberations of the jury, and caused or appeared to cause certain jurors to abandon their positions and change their votes ...," is somewhat vexing. As stated earlier the hearing on the new trial motion disclosed Smith entered the room at the jury's request for her to make coffee. No deliberations took place while she was in the room. Smith, and all the juror's who testified said her comments about wanting to go home at 5:00 o'clock were made in a joking or teasing manner. The actual time the comments were made was placed at 3:30 by Smith and several jurors, but about 45 minutes later by the juror who wrote the letter.

▇▇▇▇ The threshold matter on this point is the long standing rule that a juror may not impeach the verdict as to misconduct inside or outside the jury room whether before or after the jury is discharged. *Jones v. Wahlic*, 667 S.W.2d 729, 731 (Mo. App.1984). The inadmissibility of such evidence whether by testimony affidavit or otherwise, may however be waived, and when received in evidence without objection, the party who should have objected waives all right to complain of the court's consideration of such evidence. *Thorn v. Cross*, 201 S.W.2d 492, 496–97 (Mo.App. 1947). The record here shows no objection

to the admissibility of the evidence by Fletcher/Mayo so the rule does not apply in this case.

Shearin states the comments were innocent but improper and, while couched in words that they "appeared" to cause a change in the vote, seems to suggest the effect was similar to a "hammer instruction" being given.

 The comments here were improper. Court officers should not do anything which might influence the conduct of the jury in favor of either party. 89 C.J.S. Trial Section 455. The trial court was justified in finding the actions, though improper, did not amount to jury misconduct and result in prejudice to the plaintiff. *Rovak v. Schwartz*, 339 S.W.2d 756, 757, 758 (Mo. 1960); *Bailey v. Hilleman*, 566 S.W.2d 504, 506 (Mo.App.1978). Considered on the merits it appears from the record of the two jurors who did change their votes prior to return of the verdict at 4:50, one had been in the restroom and did not hear the comments in question—the other's testimony related to facts entirely different from what happened. All 9 jurors who signed the verdict testified the comments were joking in nature and did not influence their vote in any way.

This case falls far short of the situation in *Thorn, supra*, where a juror deliberately concealed direct knowledge of the accident in question. *State ex rel. Highway Commission v. Lock*, 643 S.W.2d 46, 48 (Mo. App.1982). Based upon similar facts the reasoning and result found in *Williams v. Yellow Cab Co.*, 11 Ill.App.2d 112, 136 N.E.2d 582 (1956) 136 N.E.2d at page 585 here applies:

> The case was given to the jury around 4:30 o'clock in the afternoon. The parties agreed that if a verdict was not reached by 10:30 the jury should be permitted to separate. A verdict was reached about that time and returned in court the following morning. It appears from the testimony of the bailiffs in charge of the jury that in response to questions from the jury as to how long they were to stay, a bailiff told them they were to stay until they reached a verdict, and later, around 10 o'clock, a bailiff jokingly said, "I'm going up to get the cots." A few minutes after 10:30 a bailiff went to the jury room to dismiss the jury and was informed that they had reached a decision. Defendants concede that the conduct of the bailiffs was free from any improper motive, but contend that it coerced the jury into returning a verdict to their prejudice. The jury was polled the following morning and none repudiated his verdict. The statements complained of should not have been made by the bailiffs, but we find nothing to support the claim of coercion of the jury and prejudice to the defendants.

*Horton v. D.I. Operating Co.*, 84 Nev. 694, 448 P.2d 36, 37 (1968). *See also: Carson v. Brauer*, 234 Or. 333, 382 P.2d 79, 84 (1963); *Brossard v. Chicago M & St. P. Ry.*, 167 Iowa 703, 149 N.W. 915, 923 (1914).

 Shearin's final subpoint on misconduct is based upon the testimony of the juror's at the hearing on the motion. Three jurors during the course of testifying on the comments of the bailiff said, without objection, they had formulated an opinion before deliberations commenced, knew how they were going to vote when they left the box or before entering the jury room. The contention is this conduct violated MAI No. 2.01, given to the jury which tells them justice requires they not make up their minds until all the evidence is heard. None of the conduct of the juror's of which Shearin complains has violated the instruction. That after all the evidence had been received 3 jurors had formulated an opinion does not call for a reversal. The point is denied.

The judgment is affirmed.

All concur.

DIXON, Judge, concurring.

I reluctantly concur with the disposition in this case of the issue of juror misconduct, and I write to express my reasons for that reluctance. The majority opinion

reaches the issue and decides it by accepting the evidence from the jurors. In doing so, it relies upon an exception to the general rule arising from many decisions in the Courts of Appeal. My reluctance stems from two concerns. First, no Supreme Court decision holds in accord with the exception; and second, in my view, the exception rests upon a flawed rationale.

The following demonstrates my first concern.

The general rule in Missouri is that a juror's testimony or affidavit may not be used to impeach the verdict. *Davis v. Kansas City Public Service Co.*, 361 Mo. 168, 233 S.W.2d 669, 676 (1950); *State v. Branstetter*, 65 Mo. 149, 156–57 (1877). However, that rule "from which there is no variance in this jurisdiction," *Evans v. Klusmeyer*, 301 Mo. 352, 363, 256 S.W. 1036, 1039 (1923), has undergone some qualification. Some opinions of the courts of appeal have stated that, if the juror's testimony or affidavit is not objected to, the disqualification is waived. *Thorn v. Cross*, 201 S.W.2d 492 (Mo.App.1947).

The general rule was first stated in *Pratte v. Coffman*, 33 Mo. 71 (1862). There, the jurors looked at law books during their deliberations. After stating and adopting the rule, which has been called the *Mansfield* view, the court noted "that cases may arise, particularly when life and liberty are at stake, which may call for a departure from the rule." *Id.* at 78. In those cases, the court said it would be proper to receive the jurors' affidavits *to explain extrinsic evidence* showing juror misconduct.

The *Pratte* qualification was eliminated in *State v. Branstetter*, 65 Mo. 149 (1877). Relying on *Sawyer v. Hann. & St. Jo. R.R. Co.*, 37 Mo. 240 (1866), *State v. Coupenhaver*, 39 Mo. 430 (1867), and *State v. Underwood*, 57 Mo. 40 (1874), the court adopted as the Missouri view the strict *Mansfield* rule, that jurors may not impeach the verdict. This perception of Missouri law was reiterated in: *State v. Babb*, 680 S.W.2d 150 (Mo. banc 1984); *State ex rel. State Highway Comm'n v. Ballwin*

*Plaza Corp.*, 474 S.W.2d 842, 848 (Mo. 1971); *McDaniel v. Lovelace*, 439 S.W.2d 906, 909 (Mo.1969); *Smugala v. Campana*, 404 S.W.2d 713, 717 (Mo.1966); *Romandel v. Kansas City Public Service Co.*, 254 S.W.2d 585, 595–96 (Mo.1953); *Middleton v. Kansas City Public Service Co.*, 348 Mo. 107, 152 S.W.2d 154 (1941); *Reich v. Thompson*, 346 Mo. 577, 142 S.W.2d 486 (1940); *State v. Westmoreland*, 126 S.W.2d 202 (Mo.1939); *Steffen v. Southwestern Bell Telephone Co.*, 331 Mo. 574, 56 S.W.2d 47 (1932); *Evans v. Klusmeyer*, 301 Mo. 352, 256 S.W. 1036, 1039 (1923); *State v. Shields*, 296 Mo. 389, 246 S.W. 932, 934 (1922).

Only in dictum, in *Cook v. Kansas City*, 358 Mo. 296, 214 S.W.2d 430 (1948), has the Supreme Court retreated from the *Mansfield* rule,

> [I]t is a firmly established rule in this jurisdiction that a juror may not, by his own affidavit or testimony, impeach the jury's verdict because of the misconduct of a juror (citations omitted) unless the respondents failed to timely and properly object to the juror doing so and thereby in turn waived the incompetency of the juror to impeach the verdict.

214 S.W.2d at 433–34, *citing Thorn v. Cross*, 201 S.W.2d 492 (Mo.App.1947); *Milburn v. Robison*, 132 Mo.App. 198, 110 S.W. 598 (1908).

This dictum was repeated in *Mayberry v. Clarkson Const. Co.*, 482 S.W.2d 721 (Mo. 1972). There, the court stated, "This evidence, relied upon by plaintiffs to support the court's action, came from jurors over defendant's objection. The evidence was inadmissible, because a juror may not, *over objection*, be heard to impeach his and the jury's verdict." *Id.* at 724 (emphasis added). The court then cited the appellate decisions (e.g., *Thorn v. Cross*) that state the exception to the general rule.

The exception to the *Mansfield* rule arises only from decisions of the various districts of the Court of Appeals. Judge Ellison first stated the exception to the general (*Mansfield*) rule in *Winn v. Reed*, 61 Mo.App. 621 (1895). He said, "the rule

in this state is that a juror can not impeach his own verdict, though his evidence is competent to sustain it ... but ... the affidavit of the juror Martin was admitted without objection by plaintiff. It was, therefore, before the court, and, while it could have been rejected, it was not. The court, according to the record, received it in evidence. It had probative force, and, in the absence of objection, or rejection by the court, should be considered." *Id.* at 626.

Judge Ellison further articulated this new exception in *Milburn v. Robison,* 132 Mo.App. 198, 110 S.W. 598 (1908). There he stated, "it is said that the rule establishing the incompetency of a juror to impeach the verdict is a rule of public policy, and on that ground he should not be heard ... It does not follow that because a rule is founded on public policy it ... cannot be waived ... But where the rule is equally for the protection of the individual affected there is no reason why he should be compelled to take its benefit in spite of his desire not to invoke it." 110 S.W. at 600.

The case upon which the majority opinion relies is *Thorn v. Cross,* 201 S.W.2d 492 (Mo.App.1947). The court, basing its holding on Judge Ellison's *Milburn* case, stated, "the rule is that, although a verdict cannot be impeached by evidence or testimony of a juror, nevertheless, where such evidence is received without objection, the party who should have objected but fails to do so waives all right to complain against the court's consideration of such evidence and it is to be given its natural probative value." *Id.* at 497.

More recent decisions have followed the *Thorn* holding, that when no objection is timely made, the juror's evidence will be admitted. Among these are: *State ex rel. State Highway Comm'n of Mo. v. Lock,* 643 S.W.2d 46, 49–50 (Mo.App.1982); *Norwood v. Lazarus,* 634 S.W.2d 584, 589 (Mo. App.1982); *State v. Suschank,* 595 S.W.2d 295, 298 (Mo.App.1979); *State v. Zweifel,* 570 S.W.2d 792, 795 (Mo.App.1978); *Gantz v. Leibovich,* 569 S.W.2d 373, 374 (Mo.App. 1978); *Bailey v. Hilleman,* 566 S.W.2d 504, 506 (Mo.App.1978).

This review convinces me that the Supreme Court has never really considered the issue of the validity of the exception.

As to my second concern, I do not believe the rationale, offered in *Milburn* as justifying the exception, is sound. The Mansfield rule is undoubtedly based upon public policy considerations. *See* generally J. Wigmore, *Wigmore on Evidence,* p. 676 et seq. (McNaughton Rev.1961).

The rationale offered in *Milburn* was that since the privileges of lawyers and physicians were based upon policy considerations and waiver was permitted, this should permit the waiver in the instance of the juror implying that the privilege was a one personal to the juror.

The rule of privileged communications applies to communications among jurors during retirement. *Wigmore, supra,* Section 2346, p. 678. The waiver principle might apply when this principle alone is the basis for the exclusion of the evidence. However, the principle to which our cases adhere, the *Mansfield* rule, is not based upon the doctrine of privileged communications but upon the doctrine that no witness shall be heard to allege his own turpitude. Mansfield first enunciated this rule regarding the testimony of jurors as to misconduct in the jury room in *Vaise v. Delaval,* 1 Term R. 11 KB 1785. In that case, the affidavits of jurors admitting their decision was based upon chance were rejected. Under this doctrine, the issue of waiver is immaterial because the exclusion does not rest upon a privilege but upon a disability of the witness founded upon a basis of public policy.

The rationale of *Milburn* is flawed when it finds that the exclusion is based upon a privileged communication arising from public policy (such as attorney-client and doctor-patient privileges), and therefore subject to waiver by the possessor of the privilege. The *Mansfield* rule is upon a different footing and waiver has no place in its application.

Despite Wigmore's vehement criticism, the *Mansfield* rule has prevailed in most

American jurisdictions, including our own. 8 J. Wigmore, *Wigmore on Evidence,* pp. 695–702 (McNaughton Rev.1961).

One thing seems certain, the door to the jury room can be shut, as the *Mansfield* rule requires, or it can be opened, as Wigmore suggests. It is not so certain that it can be left ajar with an exception that has no proper rationale. The exception as it presently exists simply leads to interrogation and even harassment of the jurors and to endless disputes over the validity of verdicts.

*State v. Babb, supra,* has now made inquiry of the jurors necessary when a separation after submission occurs. The majority opinion in *Babb* limits the inquiry to support of the verdict and expressly recognizes the *Mansfield* rule that jurors may not impeach their verdict. This will raise a difficult issue on the limits of cross-examination when evidence is offered to support the verdict. On the other hand, the concurring opinion seems to suggest that the defendant may elicit from the jurors evidence of communications *to them* during separation, which would violate the rule the majority announces for the limitation of the jury person's testimony.

The issues in the instant case and those certain to arise under *Babb* demonstrate to me that the law of Missouri in this area is uncertain. That uncertainty will translate into further attempts by litigants to present issues in the general area of inquiry into jury deliberations and can only lead to further harassment and interrogation of jurors, which will cause jury service to be viewed as a greater burden by the general public.